**GLOBAL LEGAL LAW FIRM**
James C. Huber, Esq. (SBN 269488)
jhuber@attorneygl.com
Nathan A. Shaman, Esq. (SBN 272928)
nshaman@attorneygl.com
322 Encinitas Blvd., Suite 200
Encinitas, CA 92024
Telephone:  (888) 846-8901
Facsimile:  (888) 846-8902

Attorneys for Plaintiff, MiCamp Solutions, LLC

and Proposed Class

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICAMP SOLUTIONS, LLC, an Arizona Limited Liability Company, on behalf of themselves and all others similarly situated,<br><br>        Plaintiff,<br>    vs.<br><br>VISA, INC., a Delaware corporation; and DOES 1 through 10, inclusive.<br><br>        Defendant. | Case No:<br><br>Judge:<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-8901

1

**<u>TABLE OF CONTENTS</u>**

2   **I.   PARTIES** ....................................................................................... 1

3       **A. Plaintiff/Class Representative** .................................................. 1

4       **B. Defendant** ..................................................................................... 1

5   **II.   JURISDICTION AND VENUE** .................................................... 3

6   **III.   DEFINITIONS** ............................................................................... 4

7   **IV.   NATURE OF THE ACTION** ......................................................... 9

8   **V.   PAYMENTS INDUSTRY OVERVIEW** ...................................... 14

9       **A. Background of Payments Industry** ......................................... 14

10       **B. The General Payment Cards Industry** .................................. 17

11   **VI.   STATEMENT OF FACTS** ............................................................ 18

12       **A. Visa's Overwhelming Market Power** ...................................... 18

13           **1.   *Visa's Ability to Hamstring ISOs' Ability to Compete***

14           ***Through Unilaterally Raising its Rates*** ........................... 18

15           **2.   *ISOs and Their Merchants Are Pitted Against Each***

16           ***Other and Forced to Pay Cost-Prohibitive Penalties for***

17           ***Attempting Innovative Solutions that Would Improve***

18           ***their Profit Margins*** ......................................................... 20

19       **B. Visa's Latest Efforts to Push its Costs onto Consumers** ............... 24

20           **1.   *Congress Passes the Durbin Amendment to Curtail***

21           ***Visa's Market Power*** ......................................................... 24

22           **2.   *The No-Surcharge Rules*** .................................................. 25

23           **3.   *Visa's Dual Pricing Requirement Hid the Costs of***

24           ***Visa Transactions from Cardholders and Continued***

25           ***to Push those Costs onto ISOs and Merchants*** ................... 30

26           **4.   *The Harms Visa's Anticompetitive Practices***

27           ***Continue to Cause ISOs and Merchants*** ............................ 32

28

i

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

1        C. MiCamp and Other ISOs' Penalties and Loss of
2           Market Share ................................................. 33
3        D. Subclass Allegations Related to Visa's 2023 Data
4           Breach ......................................................... 35
5    VII. ANTITRUST INJURY ................................................. 37
6    VIII. RELEVANT MARKETS ............................................... 37
7        A. The Product Market is the General Purpose Payment
8           Card Network ................................................. 37
9        B. The Geographic Market for All Relevant Product
10          Markets is the United States ................................. 40
11   IX.  INTERSTATE TRADE AND COMMERCE .......................... 40
12   X.   TRADITIONAL STATE FUNCTION ............................... 40
13   XI.  CLASS AND SUBCLASS ALLEGATIONS .......................... 42
14   XII. CAUSES OF ACTION ................................................. 45
15       FIRST CAUSE OF ACTION
16       (Monopolization of the Electronic Payments Market)
17       Against Visa and the Doe Defendants .......................... 45
18       SECOND CAUSE OF ACTION
19       (Attempted Monopolization of the Electronic Payments Market)
20       Against Visa and the Doe Defendants .......................... 46
21       THIRD CAUSE OF ACTION
22       (Conspiracy to Monopolize the Electronic Payments Market)
23       Against Visa and the Doe Defendants .......................... 47
24       FOURTH CAUSE OF ACTION
25       (Violation of State Antitrust and Unfair Competition Laws)
26       Against Visa and the Doe Defendants .......................... 48
27
28

ii
**TABLE OF CONTENTS**

**FIFTH CAUSE OF ACTION**

**(Violations of State Information Practices Acts)**

**Against Visa and the Doe Defendants** .................................................... 51

**SIXTH CAUSE OF ACTION**

**(Violation of the First Amendment Under 42 U.S.C. § 1983)**

**Against Visa and the Doe Defendants** .................................................... 53

**SEVENTH CAUSE OF ACTION**

**(Void for Vagueness Under 42 U.S.C. § 1983)**

**Against Visa and the Doe Defendants** .................................................... 54

**EIGHTH CAUSE OF ACTION**

**(Sherman Act Preemption Under 42 U.S.C. § 1983)**

**Against Visa and the Doe Defendants** .................................................... 54

**XIII.  PRAYER FOR RELIEF** .................................................................... 55

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-8901

iii
**TABLE OF CONTENTS**

Plaintiff/Class Representative MICAMP SOLUTIONS, LLC ("**MiCamp**"), an Arizona limited liability company, by and through its undersigned counsel, brings this Class Complaint (the "**Complaint**") on its own behalf and on behalf of all others similarly situated, against Defendant VISA, INC. ("**Visa**"), a Delaware corporation, and DOES 1 through 20, inclusive (the "**Doe Defendants**," and when referred to with Visa, collectively, the "**Visa Defendants**") for injunctive relief and damages, and alleges as follows:

## I.     PARTIES

### A. <u>Plaintiff/Class Representative.</u>

1.      MiCamp is an Arizona limited liability company with a principal place of business in Scottsdale, Arizona, and all of its members are Arizona residents.

2.      MiCamp is in the business of promoting electronic credit and debit card processing services for merchants.

### B. <u>Defendant.</u>

3.      Visa is a Delaware corporation with a principal place of business in San Francisco, California. Visa maintains the card networks and unilaterally promulgates and enforces rules related to electronic payment processing.

4.      Before Visa's initial public offering ("**IPO**"), Visa operated Visa U.S.A. as a nonstock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California. Its owners/members included approximately 14,000 banks.

5.      Prior to Visa's IPO, Visa operated Visa International as a nonstock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California. Its owners/members included approximately 21,000 banks.

6.      Furthermore, prior to the Visa IPO, Visa U.S.A. and Visa International were each governed by a board of directors (and Visa International had regional boards of directors for each of its geographical regions) comprised of bank executives selected from their owner/member banks. Visa U.S.A. also was a regional group member of

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

**CLASS ACTION COMPLAINT**

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

Visa International.

7.      Visa U.S.A. and Visa International, and their related and/or affiliated entities and subsidiaries, conducted many corporate restructurings in 2007 and 2008 to combine several previously independent corporate entities into Defendant Visa, Inc., in preparation for its IPO. On March 19, 2008, Visa, Inc., conducted an IPO through which it offered ownership shares to the public and also issued ownership shares to its owner/member banks. As a result, Visa became and operates today as a publicly traded Delaware corporation, with its principal place of business in Foster City, California. Upon restructuring, Visa U.S.A. and Visa International became wholly owned subsidiaries of Visa, and they continue to operate as such today. Visa, Inc., Visa U.S.A., and Visa International are collectively referred to herein as "Visa."

8.      Visa operates General Purpose Payment Card Networks and did so throughout the Damages Period (as defined in section III, ¶ 18e. below, "October 1, 2011, to the date of judgment in this action").

9.      MiCamp is unaware of the Doe Defendants' true names or capacities, whether individual, corporate, associate, or otherwise, of the defendants sued herein as Does 1 to 10, inclusive, and therefore sues defendants by such fictitious names. MiCamp will amend this Complaint to show the true names and capacities of the fictiously named Doe Defendants when MiCamp ascertains the same.

10.      MiCamp is informed and believes, and on that basis alleges that at all material times, each of the Visa Defendants, as well as Does 1 through 10, was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of the others, had full knowledge of and gave substantial assistance to the alleged activities, and in doing the things alleged, each was acting within the scope of such agency, service, employment, partnership, joint venture, representation, affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the others.

///

**CLASS ACTION COMPLAINT**

## II.    JURISDICTION AND VENUE

11.    MiCamp hereby submits this Complaint under this Court's jurisdiction under 28 U.S.C. § 1331, based on federal question jurisdiction, because this action arises under the laws of the United States, specifically under Section 16 of the Clayton Act (15 U.S.C. § 26), to prevent and/or restrain violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and multiple state laws preventing unfair and/or deceptive practices, and for damages under Section 4 of the Clayton Act (15 U.S.C. § 15). The Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331, 1337, 2201, and 2202.

12.    Additionally, this Court has jurisdiction under 28 U.S.C. § 1332(d), based on diversity jurisdiction, as amended by the Class Action Fairness Act. Namely, MiCamp is a citizen of the State of Arizona, Visa is a citizen of both the State of Delaware and the State of California, the proposed Class will exceed one hundred members, and the amount in controversy exceeds $5,000,000.00.

13.    This Court also has jurisdiction over state antitrust and unfair competition law claims alleged herein under 29 U.S.C. § 1367 because all events giving rise to the causes of action asserted herein arise out of the same common nucleus of operative fact.

14.    MiCamp is informed and believes that the Doe Defendants transact business in and are found in this District.

15.    Visa transacts business in this District and maintains a principal place of business in San Francisco, California.

16.    The Visa Defendants' collective interstate trade and commerce involved and affected by the alleged violations of antitrust law occurred, in part, within this District. The acts complained about have had, and will have, substantial anticompetitive effects in the District.

17.    Venue is properly within this District under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22, and 26.

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

## III.   DEFINITIONS

18.   The following terms shall have the following meanings:

a. **"Acquiring Bank"** means a bank or other financial institution that has been authorized by a General Purpose Payment Card Network to enter into agreements with merchants that enable those merchants to accept General Purpose Payment Cards for the purchase of goods and services. Acquiring Banks authorized by the Visa-branded General Purpose Payment Card transactions are members or agents of those networks.

b. **"Anti-Steering"** means the practice of steering consumers away from using other payment alternatives by providing economic incentives for using those payment alternatives. For example, Visa steers consumers away from using cash because it requires merchants to label cash.

c. "**Cash Discount**" or "**Cash Discounting**" is – according to Visa – when General Purpose Credit (or Debit) Card prices are posted, and a discount on that price is offered to customers who pay with cash.

d. **"Charge Card"** (also referred to as a "**Travel and Entertainment Card**" or "**T&E Card**") is a General Purpose Credit Card for which the cardholder is required, under most circumstances, to pay the card balance in full each month. Diners Club cards and traditional American Express Green, Gold, Platinum and Centurion (Black) cards without preset spending limits are examples of Charge Cards. Charge Cards generate revenue for the Issuer primarily from fees charged to merchants and from annual fees charged to cardholders. In contrast, credit cards generate Issuer revenue primarily from interest charges and fees from cardholders who carry and/or revolve a monthly balance.

e. **"Damages Period"** means the period after the Durbin Amendment was enacted (October 1, 2011), to the date of judgment in this action.

f. **"Dual-Message"** transaction means an electronic payment transaction in which the authorization request and financial settlement are handled in two separate messages, and, in the

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-8901

4

U.S. market, is predominantly authenticated by cardholder signature.

g. "**Dual Pricing**" according to Visa, refers to a pricing model utilized for Cash Discounting, wherein the listed regular price of a good or service may be increased only in dollar increments to include the cost of card processing fees and both prices are displayed. And to not allow a percentage to be explicitly communicated.

h. "**Durbin Amendment**" means the first major legislation aimed towards regulating the digital payments industry, and mandates Card Networks may not interfere with "Discounting Payment Types" The Durbin Amendment or Section 1075 amended the Electronic Fund Transfer Act (15 U.S.C. § 1693 et seq.) ("EFTA") with a new section 920, codified at 15 U.S.C. § 1693o-2.

i. "**General Purpose Credit Card**" during the Damages Period means a plastic card or other physical form factor, such as key fob, provided by an Issuing Bank (as defined in section III, 18q.) that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing a line of credit extended to the cardholder by the Issuing Bank. Examples of General Purpose Credit Cards are the Visa and Mastercard credit cards, as well as certain Visa or Mastercard corporate cards, the Discover credit cards issued by Discover Financial Services, and the Optima and Blue-type credit cards issued by American Express. General Purpose Credit Cards also include Charge Cards, such as the traditional American Express card that require payment at the end of a billing cycle.

j. "**General Purpose Credit Card Network Services**" means the services and infrastructure that a network and its members provide to merchants through which payment transactions using General Purpose Credit Cards are conducted, including authorization, clearance, and settlement.

k. "**General Purpose Debit Card**" during the Damages Period means a plastic card or other physical form factor, such as key fob, provided by an Issuing Bank that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing an asset account, typically the cardholder's

demand deposit account ("**DDA**"), as a bank or other financial institution. Visa's Signature Debit Card program (the "**Visa Check Card**") and Mastercard's Signature Debit Card program (sometimes referred to as "**Debit Mastercard**") are General Purpose Debit Cards, as are PIN Debit Cards authorized over Visa's Interlink and Mastercard's Maestro networks. General Purpose Debit Cards also include prepaid cards, which access asset accounts other than the cardholder's DDA. Examples include, but are not limited to, payroll cards and cards associated with a flexible-spending account, health-reimbursement arrangement, or health-savings account. These cards are enabled to access the Card Brands "**Debit Networks**," which allow for the instant transaction of funds when a PIN number is entered contemporaneous to making the transaction.

l. **"General Purpose Debit Card Network Services"** means the services and infrastructure that a network and its members provide to merchants through which payment transactions using General Purpose Debit Cards are conducted, including authorization, clearance, and settlement.

m. **"General Purpose Payment Card"** means a General Purpose Credit Card or a General Purpose Debit Card.

n. **"General Purpose Payment Card Network"** means an electronic payment system used to accept, transit, or process transactions made by General Purpose Payment Cards for money, goods, or services and to transfer information and funds among Issuing Banks, Acquiring Banks, merchants, and users of General Purpose Payment Cards. Visa operates a General Purpose Payment Card Network.

o. **"Honor All Issuing Banks"** rules are the "Honor All Cards" rules of Visa that require any merchant that accepts Visa-branded General Purpose Credit Cards to accept all such General Purpose Credit Cards that carry the brand of that network, and the rules of Visa that require any merchant that accepts Visa-branded General Purpose Debit Cards to accept all such General Purpose Debit Cards that carry the brand.

p. **"Interchange Fees"** are fees or rates set by Visa and its owner/member banks that are paid to Issuing Banks (as defined in section III, ¶ 18q.) by merchants in conjunction with

6

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

transactions in which Visa General Purpose Payment Cards are used as a means of payment for purchases of goods and services. Interchange Fees are deducted by an Issuing Bank from the funds owed to a merchant prior to the settlement of a Visa General Purpose Payment Card transaction.

q. **"Issuing Bank"** means a bank or other financial institution that issues General Purpose Payment Cards to consumers (including business employees) to pay for goods and services at merchant locations. Issuing Banks authorized by the Visa General Purpose Payment Card Networks to issue Visa-branded General Purpose Payment Cards are members of those networks.

r. **"ISO"** or "Independent Sales Organization" means a company in the business of promoting credit and debit card processing services for merchants directly or indirectly, brokering electronic payments processing agreements for companies offering such services.

s. **"Posted Price"** means the prices posted on shelves, menus, invoices, or advertisements.

t. **"PIN Debit Card"** means a General Purpose Debit Card that is enabled to allow the cardholder to authorize a withdrawal from her bank account by swiping her card at the point of sale and entering a personal identification number ("**PIN**"). PIN Debit Card networks grew out of regional ATM networks and PIN Debit Card transactions are processed differently than Signature Debit Card transactions. Examples of PIN Debit Card networks include Visa's Interlink network, Mastercard's Maestro network, Fidelity National Information Services, Inc.'s NYCE network, and First Data Corporation's STAR network.

u. **"Premium Payment Card"** means a General Purpose Credit Card that carries a higher Interchange Fee than standard General Purpose Credit Cards and is required by a network to provide a certain level of rewards or incentives to the cardholder. The "Visa Signature Preferred Card" product and "World Mastercard Card" product are examples of Premium Payment Cards.

v. **"POS"** means point of sale. It is commonly used in the financial industry when describing transaction types and when referring

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

7

to payment terminals used to accept General Purpose Card transactions.

w. **"Regular Price"** means the tag or posted price charged for the property or service if a single price is tagged or posted.

x. **"Signature Debit Card"** means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account, usually by presenting the card at the point of sale and signing a receipt or POS terminal. Signature Debit Card transactions are processed in the same way as General Purpose Credit Card transactions. Examples of Signature Debit Cards include the Visa Check Card product and the Debit Mastercard product.

y. **"Single-Message"** transaction means an electronic payment transaction that processes the authorization request/response and financial settlement in one message, and, in the U.S. market, is predominantly authenticated by cardholder PIN.

z. "**Surcharge**" means an extra fee charged by a merchant to its customers when receiving a General Purpose Credit (or Debit) Card as a form of payment at the POS. According to Visa, any time that a price is charged more at the point of sale than the listed price of that product or service, it is deemed a Surcharge. Although Surcharges are legal in most or 48 certain states, Visa expressly restricts merchants' ability to add surcharges to transactions, which inherently pushes the cost onto the ISO and merchant, and reduces the ISO's and merchant's profit margins.

aa. **"Visa Rules"** means the private Rules that Visa promulgates and enforces upon Acquirers, ISOs, and merchants. These Rules are privately regulated by Visa, and through the enforcement of these Rules, Visa grants itself the ability to engage in a multitude of anticompetitive behaviors, which are well-documented through a history of litigation. These anticompetitive behaviors include, but are not limited to, excessively high transaction fees, which, through a series of agreements with its member banks, are fixed at a default rate, and, in turn, limit ISOs' and merchants' ability to negotiate lower fees for themselves to realize higher profit margins than the thin profit margins Visa has forced those entities to operate on, as well as the broad power to enforce quasi-criminal

8

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

penalties on ISOs and merchants for "Non-Compliant" transactions.

## IV.    NATURE OF THE ACTION

19.    MiCamp brings this action to effectuate the remedial purposes of various Constitutional, federal, and state antitrust and competition laws to protect the process of competition for the benefit of ISOs and to recover damages and obtain injunctive relief for past and ongoing anticompetitive conduct by the largest electronic payment syndicate in the United States: Visa.

20.    What many consumers do not know is that their decision to pay by credit/debit card involves merchant fees, retail price increases, and a nontrivial transfer of income from cash to card payers. These fees primarily benefit the Payment Processors, Issuing Banks, and Acquiring Banks, which shoulder almost no risk and perform very little to no services, while the ISOs perform all of the work and shoulder all of the risk, and only receive a margin above the set Interchange Rates, Payment Processor Fees, and Acquiring Bank Fees.

21.    Since 2010, ISOs have been able to provide payment systems that allow merchants to recoup the fees that they incur for processing transactions from their customers. Until 2010, ISOs had not been expressly or effectively restrained from allowing merchants to surcharge to recover those fees so that they can earn a commensurate margin.

22.    Visa, however, has sought to limit this practice for many unfair and unethical reasons, including without limit, hiding their exorbitant fees from consumers and seeking to avoid regulation.  Visa has therefore made various policies and rules and penalties that it has enforced on ISOs related to Surcharging and Cash Discounting.

23.    This action seeks to enjoin Visa from continuing to assess penalties on ISOs for the "Non-Compliant" processing activity of their merchants and rectify the damages caused by Visa through that anticompetitive conduct, which has already

**CLASS ACTION COMPLAINT**

injured ISOs, merchants, and consumers on a magnitude of hundreds of billions of dollars during the Damages Period.

24.     Prior to this action, Visa's anticompetitive behaviors are well-documented through a history of litigation and are memorialized through its own set of Rules (the "**Visa Rules**"). These anticompetitive behaviors include, but are not limited to, excessively high transaction fees which, through a series of agreements with its member banks, are fixed at a default rate by a trust of banks, and, in turn, this limits the ISOs' and merchants' ability to negotiate lower fees for themselves to realize higher profit margins than the thin profit margins Visa has forced those entities to operate on, as well as the broad power to enforce penalties on ISOs and merchants for "Non-Compliant" transactions.

25.     When the Damages Period began in 2011, after the Durbin Amendment was enacted, Visa was the instrumentality that effectuated the massive conspiracy among each association's owner/member banks that had agreed to unreasonably, and illegally, restrain competition. Prior to its corporate restructuring in 2008, Visa was organized as a joint venture and/or membership corporation, wherein the owners and members were virtually all of the competing banks that issued General Purpose Payment Cards to consumers and/or that signed merchants to accept such cards.

26.     Visa, along with its member banks, acts as a trust in plain sight, which has helped it maintain its overwhelming market power. For years, Visa and its banks were able to avoid antitrust laws, such as price-fixing laws, that the rest of businesses and society follow because of this overwhelming market power. In short, they are still not adhering to these antitrust laws and regulations today.

27.     Although Visa sold a story to its investors, wherein it painted its 2008 corporate restructuring as a way to appease regulators, it was a ruse for Visa to continue to operate with the purpose or effect of hamstringing its competition by

///

///

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

continuing to place its prohibitive transaction costs onto consumers. [1]

28.     Indeed, each of Visa's original membership corporations was governed by bank executives selected from Visa's owner/member banks. These competitors sat together on Visa's governing board of directors and agreed upon the rules that would restrain competition among them. They also sat together (likely in some sort of dungeon or lair) and determined the Visa Rules that would allow Visa to continue to assess its prohibitive costs onto ISOs and merchants in response to the added regulatory scrutiny Visa anticipated in the coming years.

29.     Specifically, around the time of Visa's IPO, Congress was drafting the Durbin Amendment, which was the first major legislation aimed toward placing regulations on the digital payments industry. When the Durbin Amendment was enacted in 2011, one of its primary aims was to curtail Visa's market power and prevent Visa from continuing to push its high Interchange Fees and other penalties onto ISOs and merchants, Visa was conspiring to produce its latest workaround to disguise those unreasonably high Interchange Fees from consumers with the purpose or effect of continuing to push its own transaction costs onto consumers to improve its own profit margins in several fashions - all of which are Visa's attempt to monitor and control the language that merchants and ISOs must use to communicate that there is a fee charged by Visa for card transactions. The first method is Visa's Dual Pricing Requirement.[2] The second method is a restriction of using pricing notices that communicate the cost of card acceptance in a percentage format and its cap on the amount that ISOs and merchants may offer as a Surcharge – Visa's Percentage Format

///

322 ENCINITAS BLVD., SUITE 200
GLOBAL LEGAL LAW FIRM
ENCINITAS, CA 92024
(888) 846-6901

---

[1] *See* Visa Inc., *Final Prospectus*, File No. 333-147296, pp. 4, 6, 18 (March 18, 2008) ("**Final Prospectus**") (acknowledging Visa's biggest risks affecting its business included, "those arising from regulatory scrutiny, legal proceedings seeking substantial damages, competitive and economic factors, and operational breakdowns," and "Interchange fees have been the topic of recent committee hearings in the U.S. House of Representatives and the U.S. Senate, as well as conferences held by a number of U.S. Federal Reserve Banks.")

[2] *See* 156 Cong. Rec. S5, 802-03 (daily ed. July 14, 2010) (Senator Richard Durbin's comments on the "Durbin Amendment").

**CLASS ACTION COMPLAINT**

Restriction. The third method is Visa's registration requirement, which allows Visa to actively police the activity of merchants, ISOs, and agents who offer Cash Discounting and other Surcharge transaction models.

30.     On the other hand, under the impression that the Durbin Amendment would prevent Visa from continuing to assess its prohibitively high Interchange Fees, ISOs and merchants began to offer pricing discounts for cash payments and surcharges, convenience fees, and other fees related to processing card payments in an effort to offset payment processing fees. Specifically, merchants sought to find a way to recover the processing costs to cardholders, and ISOs sought to limit the penalties they incurred from their merchants' "Non-Compliant" transactions, which led to many ISOs offering the adoption of Cash Discounting for their merchants. However, Visa's ability to assess penalties for any reason gave Visa the ability counteract the Durbin Amendment's ability for merchants to recover credit card fees, and, in turn, still find ways to push prohibitive fees onto ISOs and merchants in the Post-Durbin Amendment atmosphere.

31.     Specifically, Visa labeled any price displayed with the accompanying percentage for card transactions  as "Non-Compliant" Surcharged transactions, then, in response to numerous inquiries from ISOs receiving penalties on behalf of their merchants, in 2018, Visa released a bulletin explaining a new Dual Pricing Requirement, and began auditing merchants that it suspected to be "Non-Compliant," then assessed penalties on those merchants' ISOs.[3]

32.     Under this Dual Pricing Requirement, Visa began to require merchants offering the Cash Discounting model to comply with its Dual Pricing requirement or suffer the consequences of "Non-Compliant" transaction fees. And, in doing so, it advised ISOs that "[a]n example of a merchant segment that properly implements this

///

---

[3] *See* Visa, Inc., *Cash Discounting and Discount Offers Explained*, Article ID: AI08282, p. 1 (October 18, 2018).

**CLASS ACTION COMPLAINT**

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

model is automotive fuel merchants." This Dual Pricing requirement placed restrictive requirements on merchants and confused many ISOs and merchants on how to properly comply with the Dual Pricing requirement. Visa's example of how easily a gas station could comply with this requirement when selling fuel was almost laughable because it was certainly easy to show the prices for three products. Inside the store, however, dual pricing would be impossible to enforce as it would require printing two labels for multiple products that had dynamic prices, such as the ever-increasing cost of Skittles™.

33.     Essentially, this Dual Pricing Requirement had the purpose or effect of hiding Visa's transaction fees by confusing an ordinary consumer at the POS. It also had the purpose or effect of continuing to push prohibitive business practices on ISOs by requiring their merchants to display side-by-side pricing of the products or services they offered, or, alternatively, list the Visa transaction price instead of the substantially lower cash price, which effectively interfered with merchant marketing practice. However, if the merchants did not do so, their ISOs would suffer the consequences of Visa assessing penalties for "Non-Compliant" transactions.

34.     One of Visa's issues with the Surcharge and Cash Discount programs are that they reveal to the consumer how much Visa charged for interchange in the United States. In the United States, Visa's interchange rate is about 2.4% on average. In Europe, the interchange rate is closer to .4% because the European Union has fought to lower the interchange rate which does not include transactions costs, or any profit margin for ISOs. By caping the surcharge rate at 3% or lower, Visa is specifically seeking to avoid regulatory pressure. And by making Cash Discount programs confusing and fining ISOs for non-compliance, Visa effectively stopped ISOs from showing consumers how much Visa charged. This also destroyed ISO's profit margins because most businesses run at small margins and the 3% processing fee makes running some businesses unprofitable. Thus, ISOs are forced to charge almost nothing while providing necessary services to the merchants including introducing the

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

13

merchant to a processing relationship and assisting them through the underwriting and approval process, procuring equipment, providing customer service and technical support, communicating any issues between the Processors and Acquiring Banks, and paying fines, fees, and penalties incurred by the merchants.

35.    When COVID-19 spurred a global pandemic, businesses shifted to selling online.  Online merchants have a higher interchange rate.  With the combination of already existing Visa's cost-prohibitive fees it forced upon ISOs and merchants, Visa unilaterally raising the rates of those cost-prohibitive fees, and other economic factors caused by the pandemic, such as inflation and depressed sales, Cash Discounting became even more widespread.

36.    However, this only exacerbated Visa's anticompetitive behaviors and inadvertently granted Visa a larger market of ISOs and merchants from which Visa could unilaterally assess significant penalties for "Non-Compliant" transactions. In doing so, Visa took advantage of its confusing Dual Pricing Requirements and assessed substantial penalties for "Non-Compliant" Surcharges on merchants who only listed the cash price as the Posted Price or who charged an additional fee regardless of payment type thereby limiting ISOs and merchants' payment methods for cash transactions over which Visa has no governance. Moreover, these fees disparately affected ISOs as they frequently covered those merchants' losses.

37.    As alleged herein, even though Congress has enacted the Durbin Amendment and even though such Surcharges are allowed under many applicable states' laws, ISOs have consistently been assessed penalties for offering these Cash Discounting programs to their merchants, and Visa's assessment of penalties related thereto has inevitably caused excessive damages to ISOs, who already infamously operate on thin profit margins.

### V.    PAYMENTS INDUSTRY OVERVIEW

### A. Background of Payments Industry.

38.    The payments industry is a complex and dangerously unregulated

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

ecosystem that involves multiple parties. The main players are the third-party financial institutions, the payment processors, the ISOs, the merchants, and the cardholders.

39.    The third-party financial institutions are known as the acquiring banks, or an "Acquirer" (as defined under section III, ¶ 18a. above, an "**Acquiring Bank**" is a bank or other financial institution that has been authorized by a "**General Purpose Payment Card Network**" to enter into agreements with merchants that enable those merchants to accept "**General Purpose Payment Cards**" for the purchase of goods and services).

40.    The "**Issuing Bank**" is the bank that issues the payment cards used by the customer that purchases transactions from the merchant.

41.    The Acquiring Banks and Issuing Bank are authorized by the Visa-branded General Purpose Payment Card Transactions and are "Member Banks" or agents of Visa's General Purpose Payment Card Network (collectively, the Acquiring Banks and Issuing Banks are referred to as "**Member Banks**").

42.    ISOs typically contract with Payment Processors (the "**Payment Processor**") and Issuing Banks to broker electronic payment processing services to merchants under an "**ISO Agreement**."  The Payment Processor's role is to manage the electronic payment processing between merchants and their customers. The Payment Processor verifies and authorizes the electronic payment transactions between the Member Banks. The Payment Processor is responsible to verify the authenticity of transactions, provide security from data breaches, complete the transactions between the Members, ensure that the merchants receive payment, and cover the costs and risks associated with processing the payment

43.    Under the ISO Agreement, Payment Processors shift almost all of the risk of loss to the ISO, for example, related to any penalties from Visa.

44.    The "Card Brands" include  Visa®, Mastercard®, American Express®, Discover®, China UnionPay®, and JCB® (collectively, the "**Card Brands**.")  The Card Brands' role is generally that they maintain the "**Network**," which is the entire

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

ecosystem where transactions are processed. The Card Brands are all for-profit corporations. The Card Brands unilaterally define the business rules for purchases made with credit/debit cards; define the standards by which the Acquirers must process the transactions; regulate who, where, and how cards are used; set the base rate fees charged to merchants, (the "**Interchange Rates**,"); enforce their rules; and act as the arbiter between the Member Banks.

45.     Under the ISO Agreement, ISOs provide various services to merchants and in exchange, the ISO receives compensation on any transaction and merchant account that is above the Interchange Rates, fees charged by the Payment Processor and Acquiring Bank, under each respective merchant processing agreement (the "**MPA**") that it brokers on behalf of the Acquiring Bank and Payment Processor. The MPA is between the ISO, Payment Processor, Acquiring Bank, on one hand, and the Merchant, on the other.

46.     ISOs effectively serve as a middleman between the Members, the Payment Processors, and merchants.

47.     The Payment Processors pay ISOs "**Residual Income**," monthly related to the fees that ISOs charge above the Interchange Rates and the fees charged by the Payment Processor and Acquiring Bank.

48.     Under the ISO Agreement, the Payment Processor and Acquiring Bank push their responsibilities downstream onto the ISO, including without limit the risk of loss, such as "**Chargebacks**," where a customer successfully disputes a transaction or penalties from the Card Brands.

49.     As discussed above, MiCamp is an ISO, similarly situated to the tens of thousands of other ISOs. MiCamp has a written agreement (the "**MiCamp Marketing Agreement**") between MiCamp, Wells Fargo Bank, N.A. ("**Wells Fargo**") that is the Acquiring Bank, and First Data Merchant Services LLC f/k/a First Data Services Corporation ("**First Data**") that is the Payment Processor. The MiCamp Marketing Agreement was executed on or about February 12, 2009, and most recently renewed

March 1, 2019. A true and correct copy of the MiCamp Marketing Agreement is annexed hereto as **Exhibit 1**.

50.     MiCamp is a registered ISO with the Card Brands.

51.     MiCamp and all ISOs, when they register, agree to the same registration packet with Visa.

**B.  The General Payment Cards Industry.**

52.     There are two main categories of General Payment Cards: General Purpose Credit (including charge) Cards and General Purpose Debit Cards. General Purpose Debit Cards are similar to General Purpose Credit Cards but require that the full balance be paid upon receipt of the billing statement. General Purpose Debit Cards are linked to a customer's demand deposit account ("**DDA**") and immediately withdraw money from a DDA or are prepaid.

53.     Aside from Interchange fees, Issuing Banks also earn income on General Purpose Payment Cards through fees and charges to the cardholder, including interest on the account, and the fees and penalties that come with late payment on card balances. Issuing Banks earn income on General Purpose Debit Cards through the opportunity to use the funds a consumer maintains in his or her account, and on various fees associated with those accounts. Banks also earn income on credit and debit cards through the interchange fees paid by merchants, and sometimes ISOs on the merchant's behalf, including MiCamp.

54.     Interchange fees are imposed on merchants by the Card Brands for the privilege of accepting the Issuing Bank's General Purpose Credit (or Debit) Card from a consumer as a means of payment, and are collected from the merchant and paid to the Issuing Bank and to the Card Associations. The profitability to those entities related to General Purpose Credit (and Debit) Cards directly increases with the size and frequency of transactions in which the cards are used. General Purpose Credit (and Debit) Cards are among the most profitable portions of the Issuing Banks' businesses, generating significant revenue through high-interest rates, interchange and other fees,

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

and other ancillary products.

55.     On the other hand, ISOs are often the party that works to integrate the merchants with the untouchable Acquiring Banks and Processors.  The ISOs are responsible for servicing the merchant according to the terms of their tri-party Marketing Agreement between themselves (the ISO), the Acquiring Bank, and the Processor. Due to the several contractual restraints Visa's anticompetitive syndicate places on the Issuing Bank and Acquiring Bank, ISOs are essentially left with little room to negotiate their own profit margins. Inevitably, ISOs operate on substantially thinner profit margins than the Acquiring Bank or Issuing Bank, and ISOs earn income through Residuals that are earned by the merchants' processing volume despite that they do all of the work and shoulder all of the risk.

## VI.    STATEMENT OF FACTS

### A. <u>Visa's Overwhelming Market Power.</u>

56.     Visa's substantial market power in the payment processing marketplace and that market power over ISOs is supported by direct evidence. That evidence includes: (1) Visa's ability to hamstring ISOs' ability to compete through unilaterally raising its rates without losing transaction volume; and (2) Visa's ability to enforce prohibitive compliance rules onto ISOs and merchants who are not in the position to negotiate their own rates to improve their own profit margins.

#### 1. *Visa's Ability to Hamstring ISOs' Ability to Compete Through Unilaterally Raising its Rates*.

57.     As the Second Circuit previously held, Visa's "ability to price discriminate also illustrates [its] market power …. Visa … charge[s] differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards." *United States v. Visa U.S.A. Inc.*, 163 F. Supp.2d 229, 240-41 (2d Cir. 2003). However, the United States' public causes of action and Congress's enforcement of Durbin failed to curtail this market power.

58.     Visa's successful enforcement of anticompetitive rules and policies that

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

harmed ISOs, merchants, and consumers without losing merchant acceptance or transaction volume, or incurring any bank defection from the syndicates, further demonstrates the substantial market power that Visa had, and still has, in the General Purpose Payment Card markets. Despite the adverse economic impact of these rules and policies on ISOs, merchants, and their customers, merchants could not afford to stop processing Visa transactions because of Visa's substantial market power.

59.    In the General Purpose Credit Card Network Services market, Visa raised General Purpose Credit Card Interchange Fees without merchants ceasing to accept Visa's General Purpose Credit Cards. In fact, Visa typically gained volume after these increases. [4] For example, during the Damages Period, Visa permitted Issuing Banks to reclassify standard Visa General Purpose Credit Cards as Premium Payment Cards and, at the flip of a switch, the Interchange Fees that merchants paid for transactions made with such cards increased dramatically. Notwithstanding the vigorous merchant opposition to these punitive price increases, Visa has not realized a significant loss in processing activity as a result, and maintained its substantial market power. [5]

60.    Visa's Interchange Fee increases caused more in profit to Visa and the Issuing Banks compared to any benefit that Visa claims those increases provided cardholders. Although Visa historically has claimed that Interchange Fees are simply passed through to cardholders as rewards, the Issuing Banks keep more than half the Interchange Fees they receive as supra-competitive profits. [6]

61.    Visa continues to possess by far the highest market shares and the highest

---

[4] *See e.g.,*
https://annualreport.visa.com/financials/default.aspx#:~:text=Operational%20Highlights%2C%20%2C%20Total%20volume%2C%20including%20payments,$8.8T%2C%20140.8B%2C%20%2C%202022%2C%20$14.1T%2C%20$11.6T%2C%20192.5B%2C

[5] *See e.g.,* https://www.statista.com/statistics/279469/market-share-of-credit-card-companies-in-the-united-states-by-purchase-volume/; https://www.fool.com/the-ascent/research/credit-debit-card-market-share-network-issuer/; https://upgradedpoints.com/credit-cards/us-credit-card-market-share-by-network-issuer/.

[6] *See e.g.,* https://www.richmondfed.org/publications/research/economic_brief/2011/eb_11-05.

**CLASS ACTION COMPLAINT**

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

number of General Purpose Credit Cards in circulation throughout the Damages Period. Accordingly, most merchants must accept Visa General Purpose Credit Cards to remain viable.

62.   At the beginning of the Damages Period, Visa raised its Signature Debit Card Interchange Fees, and, then throughout the Damages Period, Visa exercised its monopoly power to increase PIN Debit Card Interchange Fees as well. Notwithstanding these price increases, Visa's General Purpose Debit Card volumes have increased during the Damages Period. As with Visa's General Purpose Credit Cards, merchants could not drop Visa's Signature Debit or PIN Debit Card products despite these significant price increases. Visa's ability to increase Interchange Fees without losing merchant acceptance or transaction volume directly evidences its monopoly power in the General Purpose Payment Card market.

### 2. ISOs and Their Merchants Are Pitted Against Each Other and Forced to Pay Cost-Prohibitive Penalties for Attempting Innovative Solutions that Would Improve their Profit Margins.

63.   Visa's success in forcing ISOs to offer products where they have little to no control over their own profit margins, and in forcing consumers to accept and use technologically inferior products—including products, such as General Purpose Payment Cards with higher Interchange Fees, that Visa knew would increase its opportunity to asses "non-compliance" penalties because merchants would attempt to offer to curtail the higher Interchange Fees by offering payment options like Cash Discounting and Surcharging—is further evidence of its substantial market power. For example, Visa could have dramatically reduced General Purpose Payment Card fraud in the United States during the Damages Period simply by encouraging ISOs to offer Cash Discounting to merchants because cash transactions are an in-person transaction that only requires the exchange of currency from one's hand to another one's hand, which inherently reduces the risk of fraud. Visa has explicitly stated that it wants to steer consumers away from using cash thereby interfering with consumer choice and

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

the Federal Reserve.

64.     Similarly, Visa could have reduced fraud and the associated penalties it pushed onto ISOs and merchants by adopting new card technology to replace the decades-old, fraud-prone technology they forced merchants and consumers to use: a magnetic-stripe card verified by cardholder signature, which is tantamount to no verification at all. In fact, for years, Visa chose to do so without a PIN, notwithstanding the clear security risks of that approach, because doing so supported Visa's plan to maintain its monopoly in the General Purpose Debit Card Market. In doing so, Visa reasoned that it could charge higher Interchange Fee rates on non-PIN transactions because it was a less secure method of payment.

65.     In the interim, because of its substantial market power, Visa was able to shift most of the cost of fraud losses to ISOs and merchants in this country through the imposition of various compliance programs and liability rules. Visa did so because it and its owner/member banks profit from fraud, which creates a pretextual justification for high Interchange Fees. Visa also profited from fraud through punitive penalties and fees for data breaches, another manifestation of its substantial market power. Specifically, allegedly fraudulent transactions lead to chargebacks, which Visa assesses upon the merchants' ISOs, and the ISO usually pays the chargeback on behalf of the merchant if the merchant does not.

66.     When a merchant accepts a Visa General Purpose Payment Card as payment for a transaction, that merchant is the direct purchaser of General Purpose Payment Card Network Services and directly pays the Interchange Fees associated with that transaction to the Issuing Bank. The Issuing Bank deducts the Interchange Fee from the sale price due to the merchant. Accordingly, Issuing Banks account for Interchange Fees as revenue, some of which is used to fund cardholders' rewards on certain cards, which of course have higher interchange rates, and merchants account for Interchange Fees as an expense. In contrast, Acquiring Banks do not account for Interchange Fees as an expense. In other words, the merchants are funding

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

**CLASS ACTION COMPLAINT**

cardholders' rewards as opposed to Visa.

67.    Issuing Banks' deduction of Interchange Fees from the sale price stands in contrast to the payment of several network assessments imposed on Acquiring Banks. Acquiring Banks pay these network assessments directly. The network assessments are charged to the Acquiring Bank, typically as part of a monthly invoice, and must be paid directly by them like any other cost of doing business (*e.g.*, their electricity bill). Acquiring Banks treat network assessments as expenses, unlike their treatment of Interchange Fees.

68.    Visa's utilization of its Interchange Fees, and practices that it deems "Non-Compliant" and issues penalties thereon, has prevented other members of the digital payments ecosystem—especially ISOs and merchants—from realizing the price-reducing benefits and competing on price, which would have occurred in a competitive market.

69.    Although merchants should be able to appeal these penalties directly to Visa, within this digital payments ecosystem, when Visa assesses additional fees as penalties on merchants, it assesses these penalties on the ISO that is essentially the merchants' only advocate and first line of defense against paying the prohibitive Interchange Fees and "Non-Compliant" transaction penalties that Visa seeks to assess.

70.    While the ISO has the option to pass the penalties that Visa assesses onto the merchant, it would likely put many merchants out of business to pay a huge fine. Thus, the ISOs bear the cost of the fees or other penalties that Visa assesses on its merchants despite that the ISOs' profit margins are substantially thinner than that of Visa, the Issuing Bank, or the Acquiring Bank. Due to this disparity, the ISO often cannot afford to lose merchants' processing volume or cannot sustain the reputational harm associated with a merchant leaving its portfolio.

71.    In extreme scenarios, wherein the ISO chooses not to cover the merchants' penalties and, instead, chooses to allow the merchant to bear the fees that Visa has assessed on the merchant, it has exposed ISOs to additional liabilities,

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-9901

1    including costs associated with arbitrations or other legal actions from the merchant
2    who are placed under the perception that the fee was assessed unfairly.   Further,
3    merchants have canceled their services based on these restrictions and penalties too.

4         72.    In addition to inflicting direct anticompetitive harm on ISOs, merchants,
5    and cardholders with these conspiracies to restrain competition throughout the
6    Damages Period, the Visa Defendants also have used them to acquire and maintain
7    their substantial market power. And, once a merchant starts accepting Visa's General
8    Purpose Payment Cards for payment, it is virtually impossible to stop accepting them.
9    Once Visa acquired substantial market power over merchants, they maintained it by
10   forcing ISOs and merchants to pay even higher Interchange Fees to continue to fund
11   Visa's anticompetitive schemes and thereby perpetually maintain and enhance its
12   market power through the present day.

13        73.    As the natural and intended consequences of Visa's anticompetitive
14   conduct, it is able to dominate the market, hide its exorbitant fees from consumers and
15   lawmakers, and, essentially, create its own set of rules because accepting General
16   Purpose Cards has become so vital to successful commerce. In doing so, Visa took the
17   opportunity to continuously find workarounds to the litigation challenges it faces and
18   continuously improve its own profits at the expense of the other parties in the payments
19   ecosystem. Specifically, Visa's dominant market power has allowed it to assess
20   unreasonable penalties and fees against ISOs and merchants that it deems Non-
21   Compliant with its rules, and also allowed it to maintain Interchange Fees on General
22   Purpose Credit Card and Debit Card transactions at supra-competitive levels.

23        74.    The Visa Defendants' anticompetitive conduct during the Damages
24   Period was not reasonably necessary to operate their General Purpose Payment Card
25   Networks. In numerous instances, banks examined ways to differentiate their own
26   cards from their competitors' at the POS through arrangements with merchants that
27   would have benefited their cardholders. Even though such differentiation, i.e.,
28   competition, was in the Issuing Banks' individual interests, they did not engage in such

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

competition because it was prohibited by Visa's rules.

**B. <u>Visa's Latest Efforts to Push its Costs onto Consumers.</u>**

    *1. Congress Passes the Durbin Amendment to Curtail Visa's Market Power.*

75.    Visa's monopoly power in the General Purpose Debit Card market and the supra-competitive nature of General Purpose Debit Card Interchange Fees were acknowledged when Congress passed the Durbin Amendment (Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010)[7]), which required the Board of Governors of the Federal Reserve System (the "Federal Reserve") to enact regulations to ensure that General Purpose Debit Card Interchange Fees for covered Issuing Banks (*i.e.*, banks with $10 billion or more in assets) are "reasonable and proportional" to Issuing Bank costs. Section 920(a)(2) of the EFTA, 15 U.S.C. § 1963o-2(a).

76.    In passing the Durbin Amendment, Congress made clear that the statute was designed to curtail Visa's ability to exercise substantial market power by raising Interchange Fees well above cost. Its principal author, Senator Richard J. Durbin, made numerous statements to that effect on the floor of the Senate, including the following:

> For years, Visa and Mastercard, and their big bank backers, have unilaterally fixed prices on the fees small businesses pay every time they accept a debit card from a customer. The two giant card networks control 80 percent of the debit card market—that is Visa and Mastercard. And it is no surprise that debit interchange fees have risen, even as the price of processing the transaction has fallen. Finally, Visa, Mastercard, and the Wall Street banks will face some check against their unbridled market power in the credit and debit industries.

156 Cong. Rec. S5, 802-03 (daily ed. July 14, 2010).

77.    Even though the Federal Reserve found that most Issuing Banks' costs

///

---

[7] Section 1075 amended the Electronic Fund Transfer Act (15 U.S.C. § 1693 et seq.) ("EFTA") with a new section 920, codified at 15 U.S.C. § 1693o-2.

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

were slightly above "par" (i.e., zero), to implement the Durbin Amendment, it capped both Signature Debit Card and PIN Debit Card Interchange Fees at $0.21 plus .05% plus an additional $0.01 fraud-prevention adjustment. See Regulation II, Debit Card Interchange Fees and Routing, Final Rule, 76 Fed. Reg. 43, 394 (July 20, 2011) (setting the cap); Regulation II, Debit Card Interchange Fees and Routing, Final Rule, 77 Fed. Reg. 46, 258 (Aug. 3, 2012) (adding the fraud-prevention adjustment).

78.     This cap, while significantly above cost for most Issuing Banks, substantially reduced the General Purpose Debit Card Interchange Fees that prevailed for years due to Visa's dominance of this market. Essentially, the Durbin Amendment aimed to repeal Visa's exclusive or near-exclusive agreements with Issuing Banks by requiring that all General Purpose Debit Cards bear an unaffiliated network on each card, and codified merchants' rights to control the routing of General Purpose Debit Card transactions. Once debit cards were linked to two competing networks, merchants could use their routing rights to ensure that the networks had to compete for merchant volume. That requirement subjected Visa to potential competition to reduce Interchange Fees and network fees even further in order to win merchant routing decisions. Many commentators observed that Visa could lose significant portions of its volume, and at least one concluded that up to 80 percent of Visa's PIN Debit Card volume was at risk.

79.     Faced with these material threats to its monopoly power, Visa embarked on its latest anti-competitive campaign to block the competition that the Durbin Amendment was designed to open.

### 2. The No-Surcharge Rules.

80.     Historically, No-Surcharge Rules prohibited merchants from surcharging the merchant-discount fee at the POS. These No-Surcharge Rules also work hand-in-hand with Visa's Anti-Steering and Nondisclosure Rules, which prohibit merchants from using price signals at the POS to steer customers to other payment systems with less expensive fees. Steering would be considered an expression of preference for or

against a certain network, brand, product, or payment type.

81.     Effectively, the combination of the No-Surcharge Rules and the Anti-Steering Rules render the rules against Surcharging vague and ambiguous, which allows Visa to continue to penalize ISOs for their merchants' "Non-Compliant" processing activity.

82.     For example, if a Merchant decides to purchase $10,000.00 worth of goods and pays with a Visa General Purpose Credit Card, the seller could not surcharge that other Merchant its $325.01 processing fee. Instead, the seller would either have to (1) absorb this fee from its profit on the sale or (2) raise the price of all of its goods, effectively requiring buyers to use other payment methods to subsidize the fee.

83.     In practice, even if the merchant complies with the 3% Surcharge cap that the Surcharge Rules impose, Visa still finds a way to penalize the ISO for its merchants' "Non-Compliant" processing activity in violation of its Anti-Steering rules. For example, Visa will instead assess penalties on the merchants' ISO for violating its Dual Pricing Requirement or may impose a violation if the Surcharge is not communicated in exact compliance with Visa's ever-changing rules.

84.     Specifically, these Visa Rules have the inevitable purpose or effect of restraining free speech and affecting marketing practices because of the disclosure requirements surrounding Surcharged transactions, such as the Dual Pricing Requirement, wherein the merchant is required to post either both the cash and Visa prices or just the Visa price, which is inevitably higher than the cash price.

85.     Previous merchants have litigated this issue and Visa was supposed to modify and clarify its rules to permit surcharging. [8] Moreover, one of the terms of the settlement was to drop the No-Surcharge Rule and prescribe a new four-element

---

[8] *See Animal Land, Inc. v. Visa USA, Inc.*, No. 05-CV-1210 (N.D. Ga.); *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, No. 05-1720, 986 F. Supp.2d 207 (E.D.N.Y. 2013), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) (vacating the class certification); *see also* https://www.reuters.com/article/us-usa-creditcard-settlement/u-s-judge-approves-retail-credit-card-fee-settlement-idUSBRE9BC0W120131214.

**CLASS ACTION COMPLAINT**

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

system, wherein: "[1] Merchants may surcharge the full average discount fee incurred (as determined by the prior month or last 12 months);  [2] Merchants may surcharge brand-wide (*e.g.,* all Visa or MasterCard credit card), or they employ a more nuanced strategy and impose surcharges on one or more product groups (*e.g.,* Visa Signature card or MasterCard World Elite cards, which carry higher fees for many merchants); [3] Merchant must disclose to consumers that the surcharge does not exceed the merchant's cost of acceptance, and disclose the amount of the surcharge both before it is incurred and on a receipt; and [4] If another more expensive network brand that the merchant accepts continued to restrict surcharging, the merchant may not surcharge Visa and Master Card without also surcharging transactions on that competitor network. This is the 'level-playing-field' provision." 986 F. Supp.2d 207, 234 (E.D.N.Y. 2016).

86.    However, Visa continued to steadfastly lobby merchants to not surcharge transactions because it claims that doing so "penalizes cardholders for using their preferred form of payment,"[9] and it also appealed the validity of both the class certification and the settlement agreement. In doing so, the Second Circuit held that "class plaintiffs were inadequately represented." *In re Payment Card Interchange Fee and Merch. Dis. Antitrust Litig.*, 827 F.3d 223, 236 (2d Cir. 2106). As such, Visa currently places a 3% surcharge maximum on underlying transactions and also continues to penalize ISOs for their merchants' "Non-Compliant" processing activity, which has caused millions in damages to ISOs from fees and penalties and also since ISOs cannot offer the programs consistently due to the fact that Visa issues vague rules and continues to change those vague rules, making compliance impossible.

87.    Visa also continuously utilizes an exuberant amount of capital lobbying "to promote the interests of the company and its stockholders and advancing [its]

///

---

[9]   https://usa.visa.com/content/dam/VCOM/global/support-legal/documents/merchant-surcharging-considerations-and-requirements.pdf.

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

corporate purpose."[10] Historically, such lobbying has led to Visa consistently contributing towards, among other federal agencies, the Department of Commerce and Department of Treasury, in hopes of passing rules and regulations that favor Visa's business practices. According to data available from the Senate Office of Public Records, such lobbying efforts have led to Visa spending well over $8,000,000.00 in the year 2023 alone, which is more than twice the amount of capital any of the other Card Brands have spent on lobbying.[11]

88.    While past lobbying efforts led to federal Surcharging bans, Congress and federal regulators slowly have changed this course and Surcharging has been legal on the federal level since 1984.[12] Likely because the ordinary consumer would consider the distinction between a surcharge and a discount to be the same thing—a price difference between cash and credit. Moreover, the Federal Trade Commission has argued against No-Surcharge bans.[13] As a result, current federal laws expressly allow merchants the ability to recover credit and debit cards fees.

89.    Despite these federal laws, there are differing state laws regarding the ability to Surcharge, which are also likely to be the result of heavy lobbying by credit card companies, such as Visa, in the 1980s.[14] Ironically, this targeted lobbying resulted

///

---

[10] https://usa.visa.com/content/dam/VCOM/regional/na/us/about-visa/documents/pplc-policy.pdf; *see also* *https://nam02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fusa.visa.com%2Fsolutions%2Fpolitical-engagement-and-advocacy.html&data=05%7C01%7Caoberman%40attorneygl.com%7C8b2c6d8a4b7e4d6522bb08dbf8180327%7C20d2eff374124be4ad5adbac2262a1cb%7C0%7C0%7C638376554260508831%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000%7C%7C%7C&sdata=AmkMazeDe1%2FfmtPXsgjD18M%2BU3gtPgN5fSOZxsogtn4%3D&reserved=0*

[11] *See e.g.,* https://www.opensecrets.org/federal-lobbying/industries/summary?cycle=2023&id=F06 (based on data from the Senate Office of Public Records, and includes spending from January 1, 2023, to September 30, 2023).

[12] S. REP. NO. 97-23, at 3 (1981); Cash Discount Act § 201, 95 Stat. at 144 (sunset on February 27, 1984).

[13] S. REP. NO. 97-23, at 10 (1981) (comments of Sen. Proxmire).

[14] *Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d at 439.

28

in the four largest states in terms of population (California, Texas, New York, and Florida) all passing No-Surcharge laws that were very similar to those imposed through the Visa Rules, and those states' laws represented a collective ban that affected approximately 40% of the total United States population.[15]

90.    As a result, the validity of many of those states' statutes has been challenged by merchants, and those statutes have been found void for unconstitutional vagueness in some of those states.[16] Notably, those statutes were similar in language to the requirements Visa had imposed through its previous No-Surcharge Rules and new Surcharge Requirements, and even in those states where the statutes have been held unconstitutional, Visa still enforces its own quasi-criminal penalties for "Non-Compliant" transactions that do not comply with their similarly vague Cash Discounting and Dual Pricing portions of the Visa Rules. Instead of adjusting the Visa Rules after those Constitutional challenges, Visa released a bulletin reiterating its intentions to continue imposing the Surcharge Requirements and their related quasi-criminal penalties.[17]

91.    However, there is still no uniformity, and, in the interim, merchants have been left without an answer to two key questions—if a customer asks us whether we charge more for paying with a credit card, should we ignore or dodge the question, or are we required to answer falsely in order to comply with Visa's Rules?—this has

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

---

[15] *See* CAL. CIV. CODE § 1748.1(a) (West Supp. 2015) (found unconstitutional in Italian Colors Rest. v. Harris, No. 2:14-cv-00604 (E.D. Cal. Mar. 5, 2014)); COLO. REV. STAT. ANN. § 5-2-212(1) (2014); CONN. GEN. STAT. § 42-133ff(a) (2013); FLA. STAT. § 501.0117(1) (2014); KAN. STAT. ANN. § 16a-2-403 (2007); MASS. GEN. LAWS ANN. ch. 140D, § 28A(a)(2) (West 2012); N.Y. GEN. BUS. LAW § 518 (McKinney 1984); 14A OKLA. STAT. § 2-211 (2011); 14A OKLA. STAT. § 2-417 (2011); TEX. FIN. CODE ANN. § 339.001(a) (West Supp. 2014); *see also United States Census 2010*, U.S. CENSUS BUREAU, http://www.census. gov/2010census/.

[16] *See* CAL. CIV. CODE § 1748.1(a) (West Supp. 2015) (found unconstitutional in *Italian Colors Rest. v. Harris*, No. 2:14-cv-00604 (E.D. Cal. Mar. 5, 2014)); *see also Italian Colors Rest. V. Harris*, No. 2:14-IC-00604-MCE-DAD, 2015 WL 1405507, at *9 (E.D. Cal. Mar. 26, 2015), *appeal filed*, No. 15-15873 (9th Cir. 2015), *aff'd* 878 F.3d 1165, 1179 (9th Cir. 2018); *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48-49 (2017); *Rowell v. Pettijohn*, 581 U.S. 901, 901 (2017); *Bondi v. Dana's R.R. Supply*, 581 U.S. 904, 904 (2017).

[17] *See* https://usa.visa.com/content/dam/VCOM/global/support-legal/documents/merchant-surcharging-considerations-and-requirements.pdf.

**CLASS ACTION COMPLAINT**

1   likewise allowed Visa to continue to penalize ISOs for their merchants' "Non-

2   Compliant" processing activity.

3        92.    The above-mentioned confusion has led some states to pass statutes

4   expressly allowing Surcharging, so long as: (1) the seller informs the purchaser of the

5   surcharge both orally at the POS and by a sign conspicuously posted on the seller's

6   premises; and (2) the surcharge does not exceed 5% of the purchase price.[18] Notably,

7   these requirements are much clearer than those enumerated under the Visa Rules. Such

8   statutes were designed to allow merchants the freedom to surcharge and ensure that

9   customers are fully aware when making the purchase. However, even on "compliant"

10  Surcharge transactions, Visa places a 3% cap, which is lower than statutes such as

11  Minnesota's allow.[19]

12       93.    In other words, in states like Minnesota, a merchant could legally

13  Surcharge up to 5% and be in compliance with state law, but their ISO may still be

14  subject to the quasi-criminal penalties that Visa assesses. This is because when the

15  merchant surcharges over 3% or does not comply with its Anti-Steering Rules, it

16  violates the Visa Rules, and Visa penalizes the ISO for its merchants' "Non-

17  Compliant" transactions.

18       ***3.   Visa's Dual Pricing Requirement Hid the Costs of Visa Transactions
19            from Cardholders and Continued to Push those Costs onto ISOs and
                 Merchants.***

20       94.    Even after Congress passed the Durbin Amendment and No-Surcharge

21  Rules were challenged, the Visa Defendants continued to assess penalties on ISOs for

22  their merchants' "Non-Compliant" processing activity with the purpose or effect of

23  excluding competition and giving Visa a monopoly in the market for General Purpose

24  Debit Card Network Services, and utilizing this competitive advantage to continue to

25  increase its profits by suppressing the profits of ISOs and merchants through its

26  ///

27

28  [18] *See* MINN. STAT. § 325G.051.

    [19] *See Id.* (expressly allowing merchants to surcharge up to 5%)

**CLASS ACTION COMPLAINT**

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

prohibitive fees and Rules.

95.     Most recently, in response to Visa's rising costs and other economic factors, ISOs began offering Cash Discounting programs to many of their merchants to help improve the already thin margins ISOs and merchants operate on in comparison to Visa. However, Visa, yet again, has found a new workaround to increase its profits by pushing its transaction costs onto ISOs merchants, which eliminates the ISOs ability to earn a profit from its efforts. Namely, Visa has utilized its Surcharge and Cash Discount rules to assess penalties against the ISOs and scare ISOs into not offering any Surcharge or Cash Discounting Program. The no-surcharging rules remain in place for Visa General Purpose Debit Card transactions.[20]

96.     Notably, Visa enacted its Surcharge Cap, and Dual Pricing Requirement to eliminate the Cash Discounting model, continued to hide its prohibitive fees, and found a new way to assess "Non-Compliant" penalties onto ISOs and merchants. Specifically, it granted Visa the ability to continue to profit by penalizing ISOs for their merchants' "Non-Compliant" transactions even after the No Surcharge statutes of some states were ruled unconstitutionally vague and also enforce stricter rules than that of states that began to expressly allow surcharging.

97.     Under the Surcharge Requirements, Visa required, among other things, the merchant account to be registered with Visa for at least 30 days before the merchant account may offer Surcharging. Moreover, even if the merchant actually pays above 3% per transaction on its merchant account, Visa has placed a maximum "Surcharge" fee of 3% that the ISO and merchant may offer. This amount does not cover the Merchants' cost of accepting cards because it does not consider annual fees, PCI compliance fees, and other fees charged under the MPA. And it certainly does not leave any margin for the ISOs.  If the Surcharge cap were removed, and while it did not exist, ISOs would have the ability to earn 1-2% because the merchant would

---

[20] *See, e.g.*, Visa Rule 5.5 (Surcharges), *Visa Core Rules and Visa Product and Service Rules* (Apr. 15, 2023).

CLASS ACTION COMPLAINT

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

pass the fees along to the consumer, similar to a sales tax.

98.     Further, Visa prohibits any Surcharge on a Debit Card; the merchants have very little way of knowing if a Payment Card is a Debit Card. In fact, all cards are PIN enabled, including General Purpose Cards,[21] adding to the confusion.

99.     Meanwhile, the Dual Pricing Requirement mandates how a merchant must communicate its pricing if they want to provide cash discount, which is allowed under the Durbin Amendment. This Dual Pricing Requirement does so by requiring the merchant to place two prices for their products or services: a listed "regular" price and a cash price.

100.    It is not sufficient to advertise "3% cash discount" or "3% fees will be applied to credit card transactions." For any store offering more than 50 products, this is untenable. Restaurants, for example, would have to convolute their menu with multiple prices. And what would happen if customers tried to "split the tab," with some customers paying in cash, some with a Debit Card, and some with General Purpose Card? Under Visa's rules, this might require multiple price disclosures. Inherently, this has led to confusion amongst ISOs and merchants as to what is or is not "compliant" with Visa's rules, and it has caused countless "non-compliance" penalties to be assessed upon ISOs and their merchants who were simply trying to improve their profit margins or incentivize the use of cash transactions.

### 4. The Harms Visa's Anticompetitive Practices Continue to Cause ISOs and Merchants.

101.    These additional exclusionary acts continued to harm ISOs and merchants by passing the transaction costs Visa should have been bearing onto ISOs and merchants, who were left with the inability to negotiate the fees. Specifically, merchants, who at this point were, essentially, forced to accept General Purpose Card transactions, and ISOs, who are typically viewed as the merchants' primary servicer

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

---

[21] Many General Purpose Card cardholders can get a "Cash Advance" on their card by entering their PIN at ATMs.

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

and advocate, were pushed into a position where they could not negotiate more advantageous rates, which caused these newly enforced Surcharge and Cash Discounting penalties to continue to hamstring ISOs' and merchants' profit margins by enforcing "Non-Compliant" transaction penalties. Put differently, the new Surcharge and Cash Discounting penalties forced higher prices onto ISOs and merchants, which continued to restrict competition in the digital payments ecosystem.

102. Given the complexities of competitive markets, ISOs would have otherwise been able to use financial incentives and marketing, such as Cash Discounting and Surcharging, to steer merchants had it not been for Visa's anti-competitive practices during the Damages Period. Notably, these restraints on Surcharges and Cash Discounts are not reasonably needed for Visa to produce high-profit, especially when Visa's margins are significantly wider than that of the ISOs and merchants it penalizes. Indeed, competitors, such as MasterCard, American Express, and Discover, do not have nor enforce Cash Discounting or Surcharge policies as stringent as Visa's Cash Discounting or Surcharge policies.[22]

## C. MiCamp and Other ISOs' Penalties and Loss of Market Share.

103. In MiCamp's case, it had been erroneously determined by Visa that an anonymous merchant in MiCamp's portfolio had offered Cash Discounting or a "dual-pricing program" in violation of its Dual Pricing Rules when, in fact, the merchant had been adding the same card fee in the form of a percentage for all payment types as its regular pricing, a practice in the payment processing industry which does not constitute a Surcharge at all. During the Damages Period, other similar rules included Visa rules that prohibited merchants from offering discounts to consumers that used General Purpose Payment Cards that were less expensive than Visa's. Such rules were effective

---

[22] Press Release, Am. Express, American Express Agrees to Settle Class Action Litigations (Dec. 19, 2013), http://about.americanexpress.com/news/pr/2013/amex-agrees-  to-settle-class-action.aspx.; *Discover to Drop "No Surcharge" Ban*, GREEN SHEET, http://www.greensheet.com/gs_archive.php?issue_number=060301&story=9 (last visited Feb. 15, 2015); *see also Merchant Surcharge Notification Form*, DISCOVER, https://www.discoversurcharge.com (last visited Feb. 15, 2015).

1   until Visa entered into a consent decree with the Department of Justice on July 20,

2   2011, and subsequently revised them to permit such discounting.[23]

3   104.   As a result of Visa's assessment of penalties on merchants, MiCamp

4   appealed the decisions on behalf of the merchants. Visa, however, denied the appeals.

5   With little reasoning, Visa spent sixty days abdicating its responsibility, while

6   MiCamp awaited a forthcoming response regarding the unfounded assessment of the

7   merchants. This is similar to the experiences of hundreds of other ISOs and merchants

8   in the payment processing industry, who often must wait even longer for a response

9   from Visa. What's more, despite MiCamp and the merchant responding to four

10  information requests, Visa declined to speak to MiCamp or the merchant regarding the

11  surcharge issue. In negligently handling the appeals process, Visa similarly failed to

12  provide any clarification to MiCamp, and similarly situated ISOs, or the merchants

13  regarding the surcharge issue. In fact, the Visa Defendants had been acting in concert

14  with each other against MiCamp and the merchant.

15  105.   Correspondingly, as a result of the allegations contained herein, Visa

16  assessed MiCamp a fine of over $70,000.00.

17  106.   Also, the Surcharge Cap of 3% has lowered the amount that MiCamp and

18  other similarly situated ISOs can charge for their services and has cost MiCamp and

19  other similarly situated ISOs hundreds of millions in profits.

20  107.   Further, MiCamp and other similarly situated ISOs have refrained from

21  selling under Visa's Surcharge programs because of the rules and non-benefit to

22  merchants and a lower margin to ISOs.  And MiCamp and other similarly situated

23  ISOs have drastically decreased selling Cash Discount and Surcharge programs due to

24  the ambiguity in their Rules, threat of penalties, and that offering the program as

25  directed is untenable for most merchants. This too has cost MiCamp and other

26

27  [23] *See*, *e.g.*, Visa Rule ID#: 111011-010410-0008590 (Discount Offer – U.S. Region 5.2.D.2
    (Updated)), Ch. 6—Payment Acceptance—Honoring Cards—Discount at the Point of Sale, Visa

28  International Operating Regulations (Oct.15, 2011) (reflecting rule effective through July 19, 2011
    and revision effective July 20, 2011).

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

34

**CLASS ACTION COMPLAINT**

1  similarly situated ISOs hundreds of millions in profits.

2      108.   Other anticompetitive rules include those that prevent banks from linking

3  to multiple networks on General Purpose Credit Cards (in violation of the Durbin

4  Amendment). It is customary for General Purpose Payment Cards to have multiple

5  network linkages on them, which is the most effective mechanism through which

6  merchants can engage in steering by way of routing transactions to less-costly General

7  Purpose Card Networks. Notably, Congress has attempted to address this attempted

8  Durbin Amendment workaround through recent legislation.[24]

9      109.   The anticompetitive restraints also include rules that prevent merchants

10 that accept Visa from testing differential acceptance or new ways to steer transactions

11 to less expensive General Purpose Payment Card Networks at certain locations that

12 operate under a single banner. That is the way most merchants pilot new products,

13 and such testing would have enabled merchants to introduce new ways to force banks

14 to compete for merchant acceptance.

15     110.   As direct consequences of Visa's anticompetitive conduct, which has

16 maintained its monopoly, ISOs and merchants, including merchants who maintain an

17 ongoing business relationship with MiCamp, have incurred damages throughout the

18 Damages Period in the form of: (1) excessive penalties related to Cash Discounting;

19 (2) the surcharge cap of 3%; (3) unclear Rules and arbitrary enforcement of the Cash

20 Discounting and Surcharging Rules, and (4) the restraints on merchants' ability to

21 communicate card fees to consumers, all of which would not have been imposed but

22 for Visa's anticompetitive conduct.

23     **D. Subclass Allegations Related to Visa's 2023 Data Breach.**

24     111.   The right to certain privacy of one's personal information, including but

25 not limited to name, social security number, address, telephone number, and financial

26 ///

---

27 [24] *See* Credit Card Competition Act of 2023, S. 1838, 118th Cong., 1 Sess. (2023) *see also*

28 https://www.cnbc.com/2023/07/30/credit-card-fee-fight-pits-payment-companies-against-retailers.html.

**CLASS ACTION COMPLAINT**

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

information, is well-settled under the United States Constitution as well as several federal statutes, state constitutions, and state statutes.

112. Under several state privacy statutes, Visa would be described as a business charged with the duty of maintaining proper records, disposing of records properly, and otherwise protecting this sensitive personal information from dissemination to the public.**25**

113. Visa negligently failed to maintain its information and allowed for third parties to access this highly confidential and proprietary information related to the ISO's customers.

114. Furthermore, as it relates to MiCamp and members of the Subclass that suffered from the data breach described herein of similarly situated ISOs, customer lists, which contain substantially similar information to that described in paragraph 111, are also entitled to certain protections under some states' common laws and statutes as protected trade secret information.

115. Despite this, and in addition to the damages described above, MiCamp and similarly situated ISOs in the Subclass, also suffered injuries related to a data breach at Visa, wherein a list Visa had possessed of ISOs and their respective merchants who were offering the above-described "Non-Compliant" Surcharge transactions was leaked.

116. Specifically, this list stated Visa's intentions to employ foot patrol agents, or as Visa coined, "secret shoppers," to confirm or deny Visa's suspicions of potentially "Non-Compliant" Surcharge from those merchants, then levy penalties on their respective ISOs.

117. In MiCamp's case, and other similarly situated ISOs in the Subclass, the information that was leaked through the data breach, as well as the data breach itself, was brought to its attention by another ISO who had publicly disseminated the

///

**25** *See e.g.,* Cal. Civ. Code § 1798, *et seq.*

**CLASS ACTION COMPLAINT**

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

information via LinkedIn, which included a nationwide list of over 29,000 merchants, as well as those merchants' respective ISOs.

118.   As a result of the data breach MiCamp and similarly situated ISOs not only faced penalties from Visa's "secret shoppers," but also faced targeted solicitations from other ISOs attempting to steal those merchants.

## VII.   ANTITRUST INJURY

119.   The Visa Defendants' price-fixing Syndicates and Visa's monopolistic conduct have caused substantial and ongoing anticompetitive harm to ISOs and merchants as direct purchasers of General Purpose Payment Card Network services as described herein.

120.   The Visa Defendants' post-Durbin Amendment Surcharge and Cash Discounting penalty schemes have also caused substantial and ongoing anticompetitive harm to ISOs in the form of reduced choices and innovation, higher prices, reduced output, and increased payment fraud because it discouraged, among other things, cash transactions, which inherently have a lower risk of fraud than General Purpose Card transactions because cash transactions only pass from hand-to-hand. Visa's monopolistic conduct has exacerbated that consumer injury through increased fraud and higher costs that are borne by ISOs and merchants. Defendants' foreclosure of that competition has therefore harmed ISOs, merchants, and cardholders.

121.   MiCamp and all similarly situated ISOs have suffered direct antitrust injury from the Visa Defendants' conduct in violation of the antitrust laws set out above. Throughout the Damages Period, MiCamp and all similarly situated ISOs were subject to Visa's rules.

## VIII.   RELEVANT MARKETS

### A. __The Product Market is the General Purpose Payment Card Network.__

122.   Visa's monopoly power in the General Purpose Payment Card market is protected by high barriers to entry. To be a viable payment network competitor, a

37

potential entrant would need both (1) widespread, if not ubiquitous, merchant acceptance; (2) large-scale distribution to consumers through Issuing Banks; (3) technology; and (4) relationships with almost every bank. While each poses a formidable barrier in its own right, the economic reality is that a new entrant must clear all barriers simultaneously. Merchants are generally unwilling to accept a payment card brand that is carried by few cardholders, and cardholders are generally unwilling to carry a payment card brand that is not widely accepted by merchants.

123.    Therefore, starting a new network, whether debit or credit, with sufficient scale to challenge Visa is extremely difficult and highly improbable. These high barriers to entry, coupled with the entrenched dominance of Visa and Mastercard, explain in large part why no meaningful entry has occurred in the General Purpose Credit Card and Debit Card markets since Discover entered nearly four decades ago in 1985.

124.    The Antitrust Division highlighted this structural barrier to entry in the context of the General Purpose Credit Card market in its "Competitive Impact Statement relating to the Proposed Final Judgment" as to Visa in *United States v. American Express Company*, No. 10-cv-4496-NGG-RER (E.D.N.Y. Oct. 4, 2010), ECF No. 5, at * 7:

> Significant barriers to entry and expansion protect Defendants' market power, and have contributed to Defendants' ability to maintain high prices for years without threat of price competition by new entry or expansion in the market. Barriers to entry and expansion include the prohibitive cost of establishing a physical network over which General Purpose Card transactions can run, developing a widely recognized brand, and establishing a base of merchants and a base of cardholders. Defendants, which achieved these necessities early in the history of the industry, hold substantial early-mover advantages over prospective subsequent entrants. Successful entry today would be difficult, time consuming, and expensive.

125.    Merchants' demand for General Purpose Payment Card Network Services (i.e., the authorization, clearance, and settlement of transactions for which a merchant

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

accepts a General Purpose Payment Card) derives from consumer demand for using General Purpose Payment Cards to pay for goods and services. Accordingly, because consumer demand establishes both a distinct General Purpose Credit Card market as well as a General Purpose Debit Card market, there are corresponding markets, based upon derived merchant demand, for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services to merchants.

126.   The distinct General Purpose Credit Card and General Purpose Debit Card markets encompass products and services provided by Issuing Banks in both markets to cardholders. In the General Purpose Credit Card market, Issuing Banks compete for cardholders by offering them various services, including rewards, and through fees and charges such as annual fees and interest rates. In the General Purpose Debit Card market, Issuing Banks compete for cardholders by offering them a bundle of services, which includes but is not limited to the General Purpose Debit Card, connected to the underlying asset account. Consumers' demand for General Purpose Credit Cards and General Purpose Debit Cards also depends, in part, on merchant demand for accepting such cards. As a result, competition by Issuing Banks for merchant acceptance and POS differentiation would have been a material feature of these markets in the absence of the conspiracies set forth in this Complaint.

127.   In the alternative, the relevant General Purpose Payment Card Network Services market encompasses the provision of network services to merchants, whose demand is derived from consumer demand, and the provision of network services to Issuing Banks that compete for cardholders based on, among other things, merchant acceptance. The interrelationship between merchant and cardholder demand for General Purpose Payment Cards, respectively, creates distinct network services markets encompassing both merchant and Issuing Bank/cardholder demand for those products. All references to relevant markets in the claims for relief set forth below are based on network services markets encompassing both merchant and Issuing Bank/cardholder demand for General Purpose Credit Cards and General Purpose

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

Debit Cards, respectively.

**B. <u>The Geographic Market for All Relevant Product Markets is the United States.</u>**

128.   The geographic market for all relevant product markets was the United States throughout the Damages Period, and that continues to be the case to this day. The applicable Visa rules regarding General Purpose Credit Card and General Purpose Debit Card transactions applied only to the U.S. market. Visa set policies and pricing separately for the United States from other regions. Additionally, U.S. consumers would not find General Purpose Credit Cards or General Purpose Debit Cards issued in other countries—and therefore other currencies—to be adequate substitutes for General Purpose Credit Cards or General Purpose Debit Cards issued by U.S. banks. Defendants also have demonstrated that their rules limited to these product markets in the United States have been profitable and have not caused ISOs or merchants to turn to other services sufficiently to make these price increases unprofitable.

## IX.   INTERSTATE TRADE AND COMMERCE

129.   The conduct of Visa, as alleged in this Complaint, was within the flow of, and substantially affected, interstate commerce. Visa provides payment solutions across the country and with respect to transactions that cross state boundaries. The Surcharge penalties and Interchange Fees at issue in this complaint likewise operate across, and without regard to, state lines.

## X.   TRADITIONAL STATE FUNCTION

130.   State action exists if, based on history and tradition, the government has been the only entity to perform the function or wield the power at issue. *Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974). No one fact can function as a necessary condition across the board for finding state action. *See Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 193 (1988). Instead, private conduct may rise to the level of state action when (1) the entity acts under the "coercive power" of the state or is

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

1 "controlled" by the state ("the compulsion test"); (2) when the state provides

2 "significant encouragement" to the entity, the entity is a "willful participant in joint

3 activity with the [s]tate," or the entity's functions are "entwined" with state policies

4 ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated

5 a public function by the [s]tate," ("the public function test").

6     131.   The conduct of Visa, as alleged in this Complaint, is that which is

7 typically reserved as a public and/or state function. Namely, Visa is fining ISOs for

8 their merchants' "Non-Compliant" transactions similar to the criminal penalties that

9 the federal, state, and local governments of the United States would assess related to

10 non-compliance with their laws. *Marsh v. State of Ala.*, 326 U.S. 501, 505-08 (1946)

11 (a private entity performing a function traditionally reserved as a public function is a

12 state actor and must abide by the First Amendment. "The more an owner, for his

13 advantage, opens up his property for use by the public in general, the more do his rights

14 become circumscribed by the … constitutional rights of those who use it."). *Brentwood

15 Acad. V. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296; *see also Lee v. Katz*,

16 276 F.3d 550, 554-55 (9th Cir. 2002) ("To satisfy the public function test, the function

17 at issue must be both traditionally and exclusively governmental").

18     132.   Although Visa's Surcharge Rules resemble the state statutes, which were

19 the result of heavy lobbying efforts of Visa and other Card Brands, such state statutes

20 have been the subject of previous litigation brought by merchants in those respective

21 states and have been held unconstitutionally vague.[26] Visa's use of paid employees, or

22 as Visa has coined them, "secret shoppers," to audit merchants and enforce its

23 Surcharge Rules, is akin to utilizing privately paid police officers to effectuate its goal

24 of continuing to asses quasi-criminal penalties on ISOs and such actions have the

25 purpose or effect of "performing the full spectrum of municipal powers." *Lloyd Corp.*,

26 ///

27

28 [26] *See* CAL. CIV. CODE § 1748.1(a) (West Supp. 2015) (found unconstitutional in Italian Colors Rest. v. Harris, No. 2:14-cv-00604 (E.D. Cal. Mar. 5, 2014)).

41
**CLASS ACTION COMPLAINT**

*Limited v. Tanner* 407 U.S. 551, 569 (1972). The employment of police forces and the enforcement of penalties are "both traditionally and exclusively governmental" functions. *Lee*, 276 F.3d at 554-55.

133.  Visa's Surcharge Rules not only regulate how merchants may characterize the price differences that they may lawfully charge for credit card purchases but also impose more stringent restrictions than states that expressly allow surcharging.[27] The Visa Rules-imposed speech code prevents the merchants from effectively conveying to their customers—who absorb the costs of credit through higher prices and services—that credit cards are a more expensive means of payment.

134.  By prohibiting certain disfavored speech by merchants—and enforcing that prohibition with "secret shoppers" and criminal penalties on those merchants' ISOs—Visa's Surcharge Rules violate First Amendment rights, as applied to the states through the Fourteenth Amendment. Because the Surcharge Rules are a content- and speaker-based restriction on speech, it is subject to heightened scrutiny under the First Amendment. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011). Regardless of whether the Surcharge Rules are analyzed under a special commercial speech inquiry, they cannot survive. The prohibited speech concerns lawful activity (engaging in Cash Discounting and Dual Pricing) and is not misleading. Neither Visa nor any state has a substantial interest in prohibiting speech and Visa's Surcharge Rules do not directly advance—and are a far more extensive than necessary to serve—any interest Visa or any state might have. *Central Hudson Gas. & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980).

## XI.   CLASS AND SUBCLASS ALLEGATIONS

135.  MiCamp brings this action on behalf of all similarly situated United States ISOs and its merchant customers under its agreements with such merchants that entered into Marketing Agreements between 2004 and the present.

///

---

[27] *See* MINN. STAT. § 325G.051.

**CLASS ACTION COMPLAINT**

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

136.   For purposes of the foregoing, a "United States ISO" is any ISO that agreed to a similar Marketing Agreement with a Payment Processor and a sponsoring Member Bank, wherein that United States ISO was forced into paying the cost-prohibitive, anticompetitive fees and services the Visa Syndicate imposes, including, but not limited to Visa's Honor All Issuing Banks principle and its Interchange Fees.

137.   For the purposes of the foregoing, the Subclass is any ISO that had its customer lists compromised in the 2023 Visa Data Breach.

138.   This action is brought under Fed. R. Civ. P. 23. The Class and/or Subclass satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

139.   **Numerosity:** The members of the Class and/or Subclass are so numerous that the joinder of all Class members is impracticable. While the exact number of Class members can be determined only by appropriate discovery, MiCamp believes that members of the Class number are in the tens of thousands.

140.   **Typicality:** MiCamp's claims are typical of the claims of the members of the Class and/or Subclass. MiCamp and the other members of the Class and/or Subclass sustained damages as a result of the Visa Defendants' wrongful conduct complained of herein.

141.   **Adequate Representation:** MiCamp will fairly and adequately protect the interests of the Class and/or Subclass and has retained counsel competent and experienced in complex litigation and who are industry-recognized experts in the payment processing industry.

142.   **Commonality:** Common questions of law and fact exist as to all members of the Class and/or Subclass and predominate over any questions solely affecting individual members of the Class and/or Subclass. Among the questions of law and fact common to the Class and/or Subclass are:

A. Whether Visa's and First Data's conduct constitutes horizontal price fixing in violation of the Sherman Act;

43

B. Whether Visa's and First Data's conduct constitutes vertical price restraints on the market in violation of the Sherman Act;

C. Whether Visa's conduct constitutes market monopolization, attempted market monopolization, or conspiracy to commit market monopolization, in violation of the Sherman Act;

D. Whether Visa and First Data violated any or all state antitrust and unfair competition laws; and

E. As to the Subclass, whether the 2023 Visa Data Breach violated applicable law and common standards.

143. **Prevention of Inconsistent or Varying Adjudications**: If the prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for Defendants. Certification of MiCamp's proposed United States ISO Class would prevent these undesirable outcomes.

144. **Predominance and Superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if the proposed United States ISO Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

145. **Notice:** Notice can be provided to the Class by means of publication of notice similar to those customarily used in other class action lawsuits.

///

///

///

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

## XII.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Monopolization of the Electronic Payments Market)

### <u>Against Visa and the Doe Defendants</u>

146.   MiCamp repeats and realleges each and every allegation contained in the proceeding paragraphs as if alleged fully herein.

147.   MiCamp brings this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class of similarly situated ISOs described above.

148.   Through the anticompetitive acts set forth above, Visa has unlawfully acquired monopoly power in the market for General Purpose Debit Card Network Services. Visa has taken acts that have the effect of giving it power over price and the power to exclude competition in the market for General Purpose Debit Card Network Services, conduct that had the purpose and effect of excluding competition from, and raising the costs of, other providers of General Purpose Debit Card Network Services.

149.   As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for General Purpose Debit Card and Credit Card Network Services were set at artificial, supra-competitive levels, and MiCamp and similarly situated United States ISOs suffered injuries to their business and property by paying such artificially-inflated, supra-competitive Interchange Fees and network fees, along with incurring Surcharge penalties for offering their merchants Cash Discount processing, incurring chargebacks and unnecessary hardware implementation costs. MiCamp suffered antitrust injury from these acts of monopolization.

150.   Visa's conduct also has harmed consumers in the relevant market by perpetuating the dominance of the fraud-prone Signature Debit product and by imposing higher costs and prices that are borne by consumers.

151.   Visa's unlawful acquisition of monopoly power constituted a violation of

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

45

Section 2 of the Sherman Act. Visa's unlawful maintenance of monopoly constitutes a violation of Section 2 of the Sherman Act, which is ongoing.

**SECOND CAUSE OF ACTION**

**(Attempted Monopolization of the Electronic Payments Market)**

**<u>Against Visa and the Doe Defendants</u>**

152.   MiCamp repeats and realleges each and every allegation contained in the proceeding paragraphs as if alleged fully herein.

153.   MiCamp brings this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class of similarly situated ISOs described above.

154.   Visa has taken acts that have the effect of giving Visa power over price and the power to exclude competition in the market for General Purpose Debit Card Network Services.

155.   Visa specifically intended to monopolize the market for General Purpose Debit Card Network Services, as evidenced by its specific intent to obtain power over Interchange Fee and network fee pricing for General Purpose Debit Card Network Services, by its specific intent to exclude competition in the market for General Purpose Debit Card Network Services, and by its specific intent to take acts with the effects of giving Visa power over price and excluding competition.

156.   To the extent it does not already possess monopoly power, there is a dangerous probability that Visa will obtain monopoly power in the market for General Purpose Debit Card Network Services through the Fees and Non-Compliance Assessments, including, but not limited to its exploitation of penalties associated with Surcharged transactions.

157.   As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for General Purpose Debit Card Network Services were set at artificial, supra-competitive levels, and MiCamp and similarly situated United States ISOs suffered injury to their business and property by paying such

46

**CLASS ACTION COMPLAINT**

GLOBAL LEGAL LAW FIRM<br>322 ENCINITAS BLVD., SUITE 200<br>ENCINITAS, CA 92024<br>(888) 846-8901

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

artificially-inflated, supra-competitive Interchange Fees, along with incurring Surcharge penalties for offering their merchants Cash Discount processing chargebacks and other unnecessary hardware implementation costs. MiCamp suffered antitrust injury from these attempted acts of monopolization.

158.  Visa's conduct also has harmed consumers in the relevant market by pushing its transaction costs onto ISOs and merchants, as well as perpetuating the dominance of the fraud-prone Signature Debit product, all of which impose higher costs and prices that are borne by consumers.

159.  Visa's attempted monopolization constituted and, through the Surcharge penalties and other Fees and Non-Compliance Assessments, continues to constitute a violation of Section 2 of the Sherman Act.

### THIRD CAUSE OF ACTION

### (Conspiracy to Monopolize the Electronic Payments Market)

### Against Visa and the Doe Defendants

160.  MiCamp repeats and realleges each and every allegation contained in the proceeding paragraphs as if alleged fully herein.

161.  MiCamp brings this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class of similarly situated ISOs described above.

162.  Visa and its owner/member banks combined and conspired among themselves with the specific intent to monopolize the market for General Purpose Debit Card Network Services. Such conspiracy included attempts to push its transaction costs onto consumers through agreements between Visa and the banks, which restrict and foreclose competition from competing PIN debit networks, and the banks' participation in Visa's strategy to exploit its Surcharge penalties and other Fees and Non-Compliance Assessments onto ISOs and merchants, as opposed to the cardholder or Visa.

163.  This conspiracy was successful, as Visa, through the overt acts described

47

above, acquired, enhanced, and maintained monopoly power in the market for General Purpose Debit Card Network Services during the Damages Period.

164.   As a direct and proximate result of Visa and the banks' conspiracy to monopolize, Interchange Fees for General Purpose Debit Card Network Services and network fees were set at artificial, supra-competitive levels, and MiCamp and similarly situated United States ISOs suffered and continue to suffer antitrust injuries to their business and property by paying such artificially-inflated, supra-competitive Interchange Fees and network fees, along with incurring Surcharge penalties for offering their merchants Cash Discount processing, chargebacks and other unnecessary hardware implementation costs.

165.   Visa's and the Doe Defendants' conduct also has harmed consumers in the relevant market by perpetuating the dominance of the fraud-prone Signature Debit product and by imposing higher costs and prices that are borne by consumers.

166.   Visa's and the Doe Defendants' conspiracy to monopolize constituted and continues to constitute a violation of Section 2 of the Sherman Act.

## FOURTH CAUSE OF ACTION

### (Violation of State Antitrust and Unfair Competition Laws)

### <u>Against Visa and the Doe Defendants</u>

167.   MiCamp repeats and realleges each and every allegation contained in the proceeding paragraphs as if alleged fully herein.

168.   MiCamp brings this state law claim on their own behalf and on behalf of each member of the proposed nationwide Class of similarly situated ISOs described above.

169.   It is California policy, as well as the policy of many other states, that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

170.   By reason of the foregoing, Defendants entered into agreements in

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

restraint of trade and/or engaged in anticompetitive practices in violation of Alabama Code § 8-10-1 et seq.

171. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Arizona Revised Stat. § 44-1401 et seq.

172. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of California Bus. & Prof. Code § 16700 et seq. and Cal. Bus. & Prof. Code § 17200 et seq.

173. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of District of Columbia Code § 28-4501 et seq.

174. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Florida Stat. Ann. § 501.201 et seq.

175. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Hawaii Rev. Stat. § 480-1 et seq.

176. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of 740 Illinois Comp. Stat. Ann. § 10/1 et seq.

177. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Iowa Code Ann. § 553.1 et seq.

178. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Kansas Stat. Ann. § 50-101 et seq.

179. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Maine

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

49

Rev. Stat. Ann. 10, § 1101 et seq.

180. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Michigan Comp. Laws Ann. § 445.771 et seq.

181. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Minnesota Stat. Ann. § 325D.49 et seq.

182. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Mississippi Code Ann. § 75-21-1 et seq.

183. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nebraska Rev. Stat. § 59-801 et seq.

184. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nevada Rev. Stat. Ann. § 598A.010 et seq.

185. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New Mexico Stat. Ann. § 57-1-1 et seq.

186. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New York General Business Law § 340 et seq. and § 369-A.

187. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Carolina Gen. Stat. § 75-1 et seq.

188. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Dakota Cent. Code § 51-08.1-01 et seq.

**CLASS ACTION COMPLAINT**

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

189.  By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Oregon Rev. Stat. Ann. § 646.705 et seq.

190.  By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Rhode Island Gen. Laws Ann. § 6-36-1 et seq.

191.  By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of South Dakota Codified Laws Ann. § 37-1-3.1 et seq.

192.  By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Tennessee Code Ann. § 47-25-101 et seq.

193.  By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Vermont Stat. Ann. 9 § 2451 et seq.

194.  By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Wisconsin Stat. Ann. § 133.01 et seq.

195.  As a direct and proximate result of Defendants' unlawful conduct, MiCamp suffered, and continues to suffer, injury to its business and property in each of these states by paying such artificially-inflated, supra-competitive Interchange Fees for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

### FIFTH CAUSE OF ACTION

### (Violations of State Information Practices Acts)

### <u>Against Visa and the Doe Defendants</u>

196.  MiCamp repeats and realleges each and every allegation contained in the proceeding paragraphs as if alleged fully herein.

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

197.   MiCamp brings this state law claim on their own behalf and on behalf of each member of the proposed nationwide Subclass of similarly situated ISOs described above.

198.   Under California Civil Code § 1798, *et seq.* (California Consumer Privacy Act), 201 CMR 17.00 (Massachusetts data privacy laws), and substantially similar laws of other states, Defendants were legally obligated to "establish appropriate and reasonable administrative, technical, and physical safeguards to ensure compliance with the [Information Practices Act of 1977], to ensure the security and confidentiality of records, and to protect against anticipated threats or hazards to its security or integrity which could result in any injury." Cal. Civ. Code § 1798.21.

199.   In violation of California Civil Code § 1798, *et seq.* (California Consumer Privacy Act), 201 CMR 17.00 (Massachusetts data privacy laws), and substantially similar laws of other states, Visa failed to properly establish appropriate and reasonable administrative, technical, and physical safeguards to ensure compliance with those state statutes, including but not limited to California Information Practices Act of 1977 with regard to MiCamp and similarly situated ISOs of the proposed Class.

200.   Defendants failed to ensure the security and confidentiality of records containing MiCamp and similarly situated ISOs of the proposed Class.

201.   Defendants failed to protect against anticipated threats and hazards to the security and integrity of records containing MiCamp and similarly situated ISOs of the proposed Class.

202.   As a result of these failures, MiCamp and similarly situated ISOs have suffered and will continue to suffer economic damages and other injury and actual harm in the form of, *inter alia*, (i) imminent, immediate and continuing increased risk of identity theft, identity fraud and risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) invasion of privacy; (iii) breach of the confidentiality of their personal information; (iv) deprivation of the value of their personal information and goodwill, for which there is a well-established

1   national market; and/or (v) the financial and temporal cost of monitoring their credit,

2   monitoring their financial accounts, and mitigating their damages.

3       203.  MiCamp and similarly situated ISOs are also entitled to injunctive relief

4   under Cal. Civil Code § 1798.47 and the substantially similar statutes.

5   **SIXTH CAUSE OF ACTION**

6   **(Violation of the First Amendment Under 42 U.S.C. § 1983)**

7   **<u>Against Visa and the Doe Defendants</u>**

8       204.  Visa's enforcement of the Surcharge Rules through assessing penalties

9   on ISOs for their merchants' "non-compliant" Surcharges has the purpose or effect of

10   a traditional public function and based on history and tradition, the government has

11   been the only entity to perform the function or wield the power at issue. *Marsh*, 326

12   U.S. 501; *see also Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974).

13       205.  Visa's Surcharge Rules regulate how the plaintiffs may characterize the

14   price differences they may lawfully charge for credit and cash purchases. The

15   Surcharge Rules allow the plaintiffs to tell their customers that they are paying *less*

16   for using cash or other means of payment (a "discount"), but not that they are paying

17   *more* for using credit (a "Surcharge"). This privately-imposed speech code prevents

18   the plaintiffs from effectively conveying to their customers—who absorb the costs of

19   credit through higher prices for goods and services—that credit cards are a more

20   expensive means of payment.

21       206.  By prohibiting certain disfavored speech by merchants—and enforcing

22   that prohibition with criminal penalties on those merchants' ISOs—Visa's Surcharge

23   Rules violate First Amendment rights, as applied to the states through the Fourteenth

24   Amendment. Because the Surcharge Rules are a content- and speaker-based

25   restriction on speech, it is subject to heightened scrutiny under the First Amendment.

26   *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011). Regardless of whether the

27   Surcharge Rules are analyzed under a special commercial speech inquiry, they cannot

28   survive. The prohibited speech concerns lawful activity (engaging in Cash

53
**CLASS ACTION COMPLAINT**

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901

Discounting and Dual Pricing) and is not misleading. Visa has no substantial interest in prohibiting speech and Visa's Surcharge Rules do not directly advance—and are a far more extensive restraint than necessary to serve—any interest it or any state might have. *Central Hudson Gas. & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980); *see also* MINN. STAT. § 325G.051 (expressly allowing up to a 5% surcharge and providing alternative channels for communication between merchants and consumers); MINN. STAT. § 471.381(2) (expressly allowing merchants to charge consumers "convenience fees" or "service charges").

## SEVENTH CAUSE OF ACTION

### (Void for Vagueness Under 42 U.S.C. § 1983)

### <u>Against Visa and the Doe Defendants</u>

207.   Visa's Surcharge Rules do not provide guidance about what speech is permitted and invite arbitrary and discriminatory enforcement. Because the Surcharge Rules makes criminal liability turn on the blurry difference between two ways of describing the same conduct, the Rule does not provide a person of ordinary intelligence reasonable opportunity to know what is prohibited. Additionally, the Surcharge Rules lacks explicit standard for those charged with its enforcement. It is therefore unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.

## EIGHTH CAUSE OF ACTION

### (Sherman Act Preemption Under 42 U.S.C. § 1983)

### <u>Against Visa and the Doe Defendants</u>

208.   Visa's Surcharge Rules allow it to keep the costs of General Purpose Card transaction hidden from consumers by preventing ISOs' merchants from communicating these costs in an effective manner. The prohibition on communication insulates Visa from competition, causes the costs of General Purpose Credit Card transactions to skyrocket, and frustrates the purpose of federal antitrust law. The Visa Surcharge Rules violate and are preempted by the Sherman Act. 15 U.S.C. § 1 *et seq*.

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-9901

# XIII.  PRAYER FOR RELIEF

Wherefore, MiCamp respectfully requests:

A. that the Court issue an order certifying the Class, approving MiCamp as Class Representative, and appointing the undersigned counsel as Class Counsel;

B. that the Court declare, adjudge, and decree that Defendants have committed the violations of law alleged herein;

C. that the Court declare, adjudge, and decree that First Data holds no legal entitlement to the $70,000.00 fine that it passed through to MiCamp.

D. that the Court award damages to MiCamp because of the Visa Defendants' misconduct in an amount to be proved at trial and to be trebled in accordance with antitrust law, plus interest (including prejudgment interest), attorneys' fees, and costs of suit;

E. that the Court enjoin Visa Defendants' enforcement of Visa's Default Interchange, assessments of Surcharge penalties despite compliance with applicable federal, state, and local Surcharge laws;

F. that the Court order Visa to comply with federal law and provide merchants routing options on all debit transactions;

G. and that the Court grant such other and further relief as it may deem just and proper.

Dated:  December 8, 2023        **GLOBAL LEGAL LAW FIRM**


By:  */s/ James C. Huber, Esq.*
      James C. Huber, Esq.
      Nathan A. Shaman, Esq.
      Attorneys for Plaintiff,
      MICAMP SOLUTIONS, LLC

GLOBAL LEGAL LAW FIRM
322 ENCINITAS BLVD., SUITE 200
ENCINITAS, CA 92024
(888) 846-6901