1   ANNE P. DAVIS (admitted *pro hac vice*)
    anne.davis@arnoldporter.com
2   MATTHEW EISENSTEIN (admitted *pro hac vice*)
    matthew.eisenstein@arnoldporter.com
3   MICHAEL A. RUBIN (admitted *pro hac vice*)
    michael.rubin@arnoldporter.com
4   **ARNOLD & PORTER KAYE SCHOLER LLP**
    601 Massachusetts Ave, NW
5   Washington, D.C. 20001-3743
    Telephone:  (202) 942-5000
6   Facsimile:   (202) 942-5999

7   SHARON D. MAYO (Bar No. 150469)
8   sharon.mayo@arnoldporter.com
    ANDREW S. HANNEMANN (Bar No. 322400)
9   andrew.hannemann@arnoldporter.com
    **ARNOLD & PORTER KAYE SCHOLER LLP**
10  Three Embarcadero Center, 10th Floor
    San Francisco, CA  94111-4024
11  Telephone:  (415) 471-3100
    Facsimile:   (415) 471-3400
12
13  Attorneys for Defendant VISA INC.

14

15                  UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17

18  MICAMP SOLUTIONS, LLC, an Arizona          Case No.:  4:23-cv-06351-HSG
    Limited Liability Company, on behalf of
19  themselves and all others similarly situated,   **DEFENDANT VISA INC.'S REPLY  IN
                                                    SUPPORT OF MOTION TO DISMISS
20               Plaintiff,                         SECOND AMENDED COMPLAINT**

21        v.                                        Date:   Hearing Vacated (ECF No. 79)
                                                    Time:   n/a
22  VISA, INC., a Delaware corporation; and DOES    Courtroom:  n/a
    1 through 10, inclusive,                        Judge:  Hon. Haywood S. Gilliam Jr.
23                                                  Action Filed:  December 8, 2023
                 Defendant.
24

25

26

27

28

---

## TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................... 1

II.    LEGAL STANDARD ............................................................................................. 1

III.   ARGUMENT .......................................................................................................... 3

    A.   MiCamp Lacks Antitrust Standing to Pursue Federal or State Claims ........................ 3

        1.   MiCamp, an Indirect Payor, Lacks Standing under *Illinois Brick* ................... 3

        2.   MiCamp Lacks Standing under the *AGC* Factors ........................................... 6

        3.   MiCamp Lacks Standing to Bring State Law Antitrust Claims ....................... 7

    B.   MiCamp Fails to Allege Essential Elements of Monopolization Claims .................... 8

        1.   MiCamp's Failure to Plead a Relevant Antitrust Market Necessitates Dismissal of Federal and State Claims ....................................... 8

        2.   MiCamp Fails to Allege Monopoly Power ...................................................... 10

        3.   MiCamp Fails to Allege Exclusionary Conduct ............................................. 12

        4.   MiCamp Does Not Allege Injury to Market-Wide Competition ................... 12

        5.   MiCamp Fails to Allege Attempted Monopolization ..................................... 12

        6.   MiCamp Does Not Allege a Conspiracy to Monopolize .............................. 13

    C.   MiCamp Fails to Allege State Antitrust or Unfair Competition Claims ................... 14

IV.   CONCLUSION ..................................................................................................... 15

**TABLE OF AUTHORITIES**

**Page(s)**

<u>Cases</u>

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999)......................................................................................... 6

*Apple v. Pepper*,
587 U.S. 273 (2019) ................................................................................................ 3, 5, 6

*Aurora Astro Prods. LLC v. Celestron Acquisition, LLC*,
691 F. Supp. 3d 1132 (N.D. Cal. 2023) ......................................................................... 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................... 1, 11, 13

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012)........................................................................................ 15

*CollegeNet, Inc. v. Common Application, Inc.*,
355 F. Supp. 3d 926 (D. Or. 2018) ................................................................................ 10

*Coronavirus Rep. v. Apple Inc.*,
No. 21-CV-05567-EMC, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) .............................. 10

*DeSoto Cab Co., Inc. v. Uber Techs., Inc.*,
No. 16-cv-06385-JSW, 2018 WL 10247483 (N.D. Cal. Sept. 24, 2018) .............................. 11

*Dream Big Media Inc. v. Alphabet Inc.*,
No. 22-CV-02314-RS, 2024 WL 3416509 (N.D. Cal. July 15, 2024)..................................... 2

*Hodgson v. Roper*,
No. 2:20-CV-00650-KJM-DB, 2022 WL 297089 (E.D. Cal. Feb. 1, 2022)............................ 2

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
627 F.2d 919 (9th Cir. 1980)..................................................................................... 10, 11

*In re Dynamic Random Access Memory (Dram) Antitrust Litig.*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007) ............................................................................ 8

*In re Interior Molded Doors Antitrust Litig.*,
No. 3:18-CV-00718-JAG, 2019 WL 4478734 (E.D. Va. Sept. 18, 2019)............................... 8

*In re Napster, Inc. Copyright Litig.*,
354 F. Supp. 2d 1113 (N.D. Cal. 2005) ............................................................................ 8

*J. Edwards Jewelry Distrib., LLC. v. Wells Fargo & Co.*,
No. 18-CV-03886-YGR, 2019 WL 2329248 (N.D. Cal. May 31, 2019) ................................ 2

*Jones v. Micron Tech. Inc.*,
  400 F. Supp. 3d 897 (N.D. Cal. 2019) ...................................................................................... 6

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008)................................................................................................. 14

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)................................................................................................................. 15

*Lorenzo v. Qualcomm Inc.*,
  603 F. Supp. 2d 1291 (S.D. Cal. 2009) ..................................................................................... 8

*Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*,
  No. 13-CV-01180-BLF, 2015 WL 4755335 (N.D. Cal. Aug. 11, 2015).................................... 6

*Morales v. City & Cnty. of San Francisco*,
  603 F. Supp. 3d 841 (N.D. Cal. 2022) ..................................................................................... 2

*Ohio v. Am. Express Co., Inc.*,
  585 U.S. 529 (2018)................................................................................... 9, 10, 12, 13

*Pernell v. City of Los Angeles*,
  650 F. Supp. 3d 910 (C.D. Cal. 2022) ............................................................................. 3, 14

*Ramirez v. Cnty. of San Bernardino*,
  806 F.3d 1002 (9th Cir. 2015)................................................................................................... 2

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019).................................................................................................... 10

## **Other Authorities**

Fed. R. Civ. P. 11 .................................................................................................... 1, 2, 4, 5

VISA'S REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT    CASE NO. 4:23-cv-06351-HSG

## I. INTRODUCTION

In its Opposition, MiCamp does not discuss this Court's order dismissing MiCamp's prior complaint (ECF No. 70) or explain why its Second Amended Complaint ("SAC") now contains factual allegations that would lead to a different result. MiCamp does not dispute that instead of *adding* factual detail that would support its antitrust standing, MiCamp *deleted* all allegations detailing its role in the payment ecosystem instead. In place of facts, MiCamp proffers conclusory "direct purchaser" labels. And ignoring the Court's Rule 11 admonition, MiCamp argues that the Court should turn a blind eye to MiCamp's prior allegations and sworn statements that established that MiCamp is a middleman that lacks antitrust standing. Notably, MiCamp does not contend that its SAC can be reconciled with its prior submissions or that it could amend the complaint further to add facts—consistent with Rule 11—to support antitrust standing under federal or state law. The Court should now dismiss with prejudice for that reason alone.

On the merits, MiCamp's defense of its monopolization claims also remains incoherent as to each element. In addition, MiCamp largely ignores Visa's arguments for dismissal of its state claims in favor of discussing "resale price maintenance"—a theory not raised in the SAC and that has no relation to the challenged surcharging rules. If this Court reaches the merits, dismissal should also be with prejudice.

## II. LEGAL STANDARD

MiCamp relies on case law pre-dating and conflicting with *Twombly* and *Iqbal* to understate its pleading burden. *Compare* Opp. at 4, *with* ECF No. 70 at 3. Thus, MiCamp cites over and over again "allegations that are merely conclusory" and unsupported by any factual details, which this Court has held insufficient under the *Twombly/Iqbal* standard. ECF No. 70 at 3 (citation omitted).

MiCamp also argues that this Court must disregard everything that has happened in this litigation prior to the SAC because the new complaint supersedes the prior complaints. Opp. at 4–5. But MiCamp ignores the multiple courts in this District that have explained that an amended complaint cannot cure problems identified in a dismissal order by deleting the prior factual

VISA'S REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT    CASE NO. 4:23-cv-06351-HSG

allegations that established a lack of standing or failure to state a claim.  Mot. at 5.[1]  The principle

that an amended complaint supersedes the original does not require the Court to accept as true

conclusory labels—such as "direct purchaser" and "purchasers (like MiCamp)" (SAC ¶¶ 8, 10–12,

15)—that have been substituted for prior contradictory and now-deleted facts.  MiCamp "cannot

avoid [renewed dismissal] by simply deleting from its amended complaint allegations evidencing

. . . the factual basis of its [prior dismissal]."  Mot. at 5 (quoting *J. Edwards Jewelry Distrib., LLC. v.*

*Wells Fargo & Co.*, No. 18-CV-03886-YGR, 2019 WL 2329248, at \*4 (N.D. Cal. May 31, 2019)).[2]

The Court may also consider the entire history of the pleadings and submissions in this case

in determining whether MiCamp could—consistent with Rule 11 (ECF No. 70 at 3–4 & 13 n.10

("any amended pleading must comply with Rule 11"))—further amend its complaint.  MiCamp asks

this Court to ignore the prior sworn declarations submitted by its executives without disputing that

its current allegations contradict those prior sworn statements.  Opp. at 5; *see also* Mot. at 3–4 nn.2–

3 (discussing contents of prior declarations); *cf. Hodgson v. Roper*, No. 2:20-CV-00650-KJM-DB,

2022 WL 297089, at \*13 (E.D. Cal. Feb. 1, 2022) (concluding that plaintiff's attorney violated Rule

11 by "offer[ing] nothing that might explain the fundamental contradiction between [plaintiff's]

complaint and his declaration").  MiCamp nowhere argues that it could add any facts to another

complaint to overcome the standing or merits flaws identified in Visa's motion.

In particular, on the central question of who directly pays non-compliance assessments

("NCAs") to Visa, MiCamp's prior sworn statements establish that MiCamp's contractual

relationships are with acquiring banks and processors and that NCAs flow through those

intermediaries.  Mot. at 3–4 nn.2–3.  MiCamp argues that these sworn statements should be ignored

because the "operative SAC alleges that Visa imposes NCA Penalties directly on MiCamp, not

---

[1] As discussed in Visa's motion, courts are "not required to accept as true [contradictory] allegations in an amended complaint without more facts," or without "a basis for disregarding . . . prior allegations"  Mot. at 5 (quoting *Morales v. City & Cnty. of San Francisco*, 603 F. Supp. 3d 841, 846 (N.D. Cal. 2022), and *Dream Big Media Inc. v. Alphabet Inc.*, No. 22-CV-02314-RS, 2024 WL 3416509, at \*4 (N.D. Cal. July 15, 2024)).

[2] MiCamp cites *Ramirez v. County of San Bernardino*, 806 F.3d 1002, 1004, 1008 (9th Cir. 2015), where a motion to dismiss targeted a prior complaint, and the Ninth Circuit concluded that an amended complaint had been properly filed and thus the motion to dismiss the no-longer-operative complaint should have been deemed moot.  That fact pattern is inapplicable here, where Visa correctly addresses the SAC and its lack of factual allegations.

VISA'S REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT    CASE NO. 4:23-cv-06351-HSG

1   through an acquiring bank or intermediary."  Opp. at 11.  But even there, MiCamp misstates its own

2   amended pleading:  "When Visa issues NCA Penalties, . . . it asks the Visa Agents to collect that

3   NCA Penalty."  SAC ¶ 80; *see also id*. ¶ 79 (Visa "act[s] through intermediaries" with respect to

4   NCAs).[3]  The sworn declarations and the full history of the pleadings establish that MiCamp lacks

5   standing and dismissal should be with prejudice.  *Cf.* ECF No. 70 at 12 & n.9 ("assertion" in prior

6   opposition "contains no factual support and appears to contradict MiCamp's complaint").

7       Finally, as shown below, MiCamp does not respond to multiple arguments raised in Visa's

8   motion.  "[I]n most circumstances, failure to respond in an opposition brief to an argument put

9   forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue."

10  *Pernell v. City of Los Angeles*, 650 F. Supp. 3d 910, 933 (C.D. Cal. 2022).

11  **III.    ARGUMENT**

12      **A.    MiCamp Lacks Antitrust Standing to Pursue Federal or State Claims**

13          **1.    MiCamp, an Indirect Payor, Lacks Standing under *Illinois Brick***

14      MiCamp invokes a muddled collection of points trying to show a direct payor relationship

15  with Visa and thereby avoid the *Illinois Brick* rule.  MiCamp cites: (1) its deletion from the SAC of

16  the facts establishing that NCAs flow through intermediaries; (2) registration of MiCamp and

17  merchants with Visa; (3) surveillance of merchants, enforcement of violations by merchants, and

18  appeals of merchants' violations; (4) an already-rejected analogy to *Apple v. Pepper*; and (5)

19  injunctive relief MiCamp does not seek under the Sherman Act.  None is availing.

20      *NCAs*.  MiCamp cannot and does not plead that Visa issues directly to MiCamp the NCAs

21  that are at the heart of its case or that MiCamp directly pays to Visa those assessments.  To the

22
---
[3] The Opposition and SAC repeatedly reference "Visa Agents" without saying who those entities
23  are.  *E.g.*, Opp. at 7, 19–20; SAC ¶¶ 79–81.  From context of this overall litigation, MiCamp can
    only be referring to acquiring banks or processors.  Mot. at 4.  But the SAC contains no such factual
24  allegation to that effect and does not allege any facts establishing them as "agents" of Visa as
    opposed to more direct customers of Visa.  Mot. at 4 n.4.  While that conclusory label and legal
25  conclusion must be disregarded, these allegations continue to concede that non-Visa entities act as
    intermediaries between Visa and MiCamp.  ECF No. 70 at 12 ("Here, the presence of multiple
26  intermediaries is equally dispositive.").  MiCamp also argues that Visa's approval of MiCamp's
    registration "was conditioned on . . . a share of the revenue."  Opp. at 6 (citing SAC ¶ 52).  But
27  Paragraph 52 of the SAC alleges that approval of MiCamp's registration was conditioned "on *the
    Visa Agents' agreement* to give Visa a share of the sale proceeds."  SAC ¶ 52 (emphasis
28  added).  Here again, then, the SAC confirms that the registration process flows through
    intermediaries.

1    contrary, as shown above, the SAC (like the prior complaints and MiCamp's declarations) confirms

2    that those assessments flow through intermediaries.  *See supra* at 2–3 & n.3.  These admitted

3    intermediaries remain "dispositive" of MiCamp's standing under *Illinois Brick*.  ECF No. 70 at 12.

4            ***Registration of MiCamp and Merchants.*** MiCamp tries to overcome *Illinois Brick* by

5    pointing to allegations about registration fees.  Opp. at 6 (citing SAC ¶ 21).  The SAC contains no

6    factual allegations establishing that MiCamp actually registers directly with Visa or pays registration

7    fees directly to Visa.  The paragraph of the SAC that MiCamp cites (Opp. at 6) alleges simply that

8    MiCamp paid registration fees without alleging that MiCamp paid those fees directly to Visa (as

9    opposed to paying them to its acquiring bank, which in turn registered MiCamp with Visa as that

10   bank's independent sales organization and for which that *bank* paid fees to Visa).  SAC ¶ 21.  MiCamp

11   does not explain why the SAC references an "Exhibit A" (SAC ¶ 78) without attaching it.  Mot. at 4.

12   From context, that exhibit appears to be a document intended to be incorporated into the SAC that

13   would show who registers MiCamp with Visa and who pays registration fees to whom.  The SAC

14   itself simply says that MiCamp "paid a $5,000 registration fee, and it pays a $5,000 annual renewal"

15   (SAC ¶ 78) but includes no specifics as to whom MiCamp made those payments.  And for good

16   reason.  Visa previously submitted evidence—incorporated by reference into the prior complaint—

17   that MiCamp's acquiring bank Wells Fargo registered MiCamp with Visa.  Mot. at 4 n.3 (citing ECF

18   Nos. 46_1, 46_10).  MiCamp does not argue that it can amend its pleading further (consistent with

19   Rule 11) to allege that MiCamp registers directly with Visa or pays a registration fee directly to Visa.

20           Nor can MiCamp establish standing under *Illinois Brick* by pointing to the requirement that

21   merchants register with Visa if they want to "participat[e] in specific payment models."  Opp. at 7

22   (citing SAC ¶¶ 59, 80).  Whatever MiCamp is (as the SAC is now silent as to its role in the payment

23   system), it is *not* a merchant.  MiCamp does not explain how *merchants'* registration with Visa

24   establishes *MiCamp's* standing.  And the SAC is silent as to whether merchant registration is directly

25   with Visa or done through intermediary acquiring banks or processors.  SAC ¶¶ 59, 80.

26           In all events, as Visa made clear in its Motion, MiCamp does not allege that any registration

27   process or related fees are anticompetitive or cause antitrust injury to MiCamp.  Mot. at 4.  Thus, even

28   if MiCamp did register and pay registration fees directly to Visa, that would not establish its standing

1     under *Illinois Brick* to challenge NCAs that are *not* charged by Visa directly to MiCamp or paid

2     directly to Visa.  MiCamp offers no response on this fundamental point.  Nor does the SAC articulate

3     any reason why requiring merchants to register prior to surcharging constitutes an antitrust violation.[4]

4            ***Surveillance of Merchant Violations, Enforcement, and Appeals.***  MiCamp also cites

5     allegations that Visa "surveils . . . *merchants*"—*not MiCamp*—for compliance with Visa's

6     surcharging rules and issues NCAs if the *merchant* violates those rules.  Opp. at 7 (emphasis

7     added).  MiCamp does not explain how surveillance of *merchants* establishes a direct relationship

8     between Visa and *MiCamp*.  MiCamp also directs the Court to its conclusory allegation that it appeals

9     assessments "directly to Visa's own employees."  Opp. at 7 (citing SAC ¶ 80).  But MiCamp does

10    not allege any facts regarding how those appeals function and does not (and cannot) dispute that any

11    appeal actually flows through Visa's acquiring bank (e.g., Wells Fargo), as shown in the appeal

12    documents previously submitted to the Court as incorporated into the prior complaints.  *See* Mot. at

13    3 n.2.  And even if an appeal were directly to Visa (it is not), MiCamp does not explain how that

14    would make MiCamp a direct payor under *Illinois Brick*.

15           ***Apple v. Pepper.***  MiCamp argues that "[t]he relationship between MiCamp and Visa mirrors

16    the one recognized in *Apple v. Pepper*, 587 U.S. 273, 279 (2019)."  Opp. at 7.  But MiCamp ignores

17    that this Court already held that *Apple, Inc. v. Pepper*, 587 U.S. 273 (2019), compels dismissal

18    here.  ECF No. 70 at 12.  MiCamp does not explain how it can—consistent with the Court's Rule 11

19    admonition— "den[y] operating under the Visa Agents' [i.e., acquiring banks' or processors'] terms

20    and assert[] a direct contractual relationship with Visa."  Opp. at 7.  MiCamp's president's sworn

21    declaration affirmatively cites only MiCamp's "agreements with Acquirers."  Mot. at 4 n.3 (citing

22    ECF No. 67–1 ¶ 13).  MiCamp's conclusory allegation of "a direct contract" (SAC ¶ 81) without

23    identifying the date, parties, terms, or anything else about that contract cannot overcome the Court's

24    prior holding (or the sworn statement of MiCamp's president).  MiCamp remains at least two steps

25

26    [4] The Court can take judicial notice of the fact that the registration requirement for merchants arises
      from a class action settlement with merchants that permitted certain surcharging and required
      merchants—not MiCamp—to give advance notice to Visa and the merchant's acquirer that the
27    merchant intended to surcharge. *See In re Payment Card Interchange Fee and Merchant Discount
      Antitrust Litig.*, No. 05-MD-1720 (JG) (JO), ECF No. 1656-1 (E.D.N.Y. Oct. 19, 2012), Definitive
28    Class Settlement Agreement ¶ 42(c)(i) ("A merchant must . . . [p]rovide Visa and the merchant's
      acquirer with . . . notice that the merchant intends to impose surcharges.").

1    removed from Visa and is thus an indirect payor under the *Illinois Brick* rule reaffirmed in *Apple*.

2    ***Injunctive Relief***.  Finally, MiCamp argues "[a]s an aside" that "even if this Court were to

3    determine that MiCamp is not a purchaser of Visa's Card Payment Processing Services, MiCamp

4    would still be entitled to seek injunctive relief."  Opp. at 7.  But MiCamp does not dispute that it only

5    seeks injunctive relief under the Cartwright Act.  Mot. at 22 n.8 (citing SAC ¶ 144).  Its argument that

6    *Illinois Brick* does not bar Sherman Act injunctive relief claims (Opp. at 7) is therefore a non sequitur.[5]

7    **2.    MiCamp Lacks Standing under the *AGC* Factors**

8    The SAC also fails to plead facts to support its standing under any of the *AGC* factors.

9    ***Antitrust Injury***.  MiCamp does not address that antitrust injury is limited to injury to MiCamp

10    that "occurred in the market where competition is being restrained."  Mot. at 7 (quoting *Jones v.*

11    *Micron Tech. Inc.*, 400 F. Supp. 3d 897, 911 (N.D. Cal. 2019) (cleaned up)).   Injury "experienced in

12    another market" is not antitrust injury.  *Id*. (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190

13    F.3d 1051, 1057 (9th Cir. 1999)).  The SAC's deletion of all facts about MiCamp's role in the

14    payments industry precludes a finding that MiCamp is a consumer or competitor in a market allegedly

15    being restrained, and that alone is sufficient grounds to conclude that MiCamp lacks antitrust injury

16    and thus standing.  *See id.* at 7–8.  Nor does MiCamp otherwise provide any "sufficient factual

17    allegations" for any conclusory assertions of harm to MiCamp to "allege a cognizable antitrust injury

18    for standing purposes."  ECF No. 70 at 12. The contradictory allegations in MiCamp's prior complaint

19    (Mot. at 8) are not necessary to reach this conclusion, but they provide further context for MiCamp's

20    silence in the SAC as to its role in the industry.  And they confirm dismissal should be with prejudice.

21    ***Derivative Injury***.  MiCamp's Opposition confirms that any impact of Visa's surcharging

22    rules on MiCamp is derivative of Visa's limitations on merchants.  MiCamp argues that Visa's Rules

23    have "restrict[ed] lawful surcharge and discounting practices" by merchants, Opp. at 10,[6] and that

24    _____

25    [5] Even if MiCamp had asserted a claim for injunctive relief under the Sherman Act, it would still be required to satisfy the first three *AGC* factors in order to establish standing to pursue injunctive relief.  *See Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, No. 13-CV-01180-BLF, 2015 WL 4755335, at *16 (N.D. Cal. Aug. 11, 2015).  MiCamp fails to plead facts to support *any* of the *AGC* factors.  *See infra* Section III.A.2.

27    [6] MiCamp is not helped by state statutes that repealed prior statutory bans on merchant surcharging. Opp. at 10; SAC ¶ 57.  Those statutes do not mandate that networks permit merchants to surcharge; rather, they repeal previous bans *by states* on surcharging, with some states imposing their own caps
(Footnote Cont'd on Following Page)

1  "Visa surveils . . . merchants" and "imposes penalties for noncompliance" by those *merchants*, *id*. at

2  7.  It also argues that Visa "suppress[es] . . . alternative service providers" that would be less

3  expensive for merchants.  *Id*. at 10.  MiCamp admits that "its own injuries are distinct" from that of

4  merchants, including "damage to MiCamp's client relationships" and "its ability to offer competing

5  services" and "diminished . . . goodwill and commercial relationships."  *Id*.  Each of MiCamp's

6  alleged injuries to itself is therefore derivative.  MiCamp also has no response to the fact that

7  merchants are already challenging Visa's surcharging rules.  Mot. at 9.

8          ***Speculative Injury***.  In its Opposition, MiCamp simply repeats conclusory assertions of harm

9  to its business from the SAC (Opp. at 11), taking issue with Visa's supposed protection of card

10  payments and supposed suppression of other forms of payments.  Mot. at 9.  But MiCamp offers no

11  explanation of how it would earn more profits if merchants steered customers *away* from the card

12  payments that generate revenue for MiCamp and to other forms of payment that do *not* generate

13  revenue for MiCamp.  *Id*.  MiCamp's allegations of injury from being "unable to offer competitive

14  pricing models" thus remain nonsensical and entirely "devoid of factual support."  ECF No. 70 at 12.

15          ***Duplicative Recovery/Apportionment***.  MiCamp argues that there is no risk of duplicative

16  recovery or need to apportion damages because the "SAC alleges that Visa imposes NCA penalties

17  directly on MiCamp."  Opp. at 11.  Putting aside that this assertion conflicts with MiCamp's prior

18  complaints and sworn declarations, *supra* at 2–3 & n.3, the SAC actually alleges the opposite.  SAC

19  ¶¶ 79–80 (Visa "asks the Visa Agents to collect th[e] NCA Penalty" and "act[s] through

20  intermediaries, such as the Visa Agents").

21          MiCamp therefore also lacks *AGC* antitrust standing to bring its Sherman Act claims as well

22  as any (unpled) claim for injunctive relief under the Sherman Act.

23                  **3.      MiCamp Lacks Standing to Bring State Law Antitrust Claims**

24          MiCamp's failure to satisfy any *AGC* factors also dooms its Arizona and California claims.

25          ***Arizona***.  MiCamp argues only that the Arizona Supreme Court has rejected *Illinois Brick*

26  (Opp. at 21), but Visa's standing argument was based on *AGC*, which Arizona does apply to

27  _____

28  and other regulations on the practice.  MiCamp's opaque references to "lawful" surcharging simply
means most states themselves no longer ban the practice in certain circumstances.  MiCamp
identifies no state law that restrains a network's ability, by rule or contract, to limit surcharging.

VISA'S REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT      CASE NO. 4:23-cv-06351-HSG

1  determine whether an indirect purchaser has antitrust standing.  *See* Mot. at 19 (citing *In re*

2  *Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal.

3  2007); *In re Interior Molded Doors Antitrust Litig.*, No. 3:18-CV-00718-JAG, 2019 WL 4478734,

4  at *16 (E.D. Va. Sept. 18, 2019)).  MiCamp does not dispute that even in *Illinois Brick* repealer

5  states, courts evaluate whether the state "would support application of the *AGC* test in assessing

6  antitrust standing."  *In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp.

7  2d at 1093.  MiCamp fails to address *AGC*, and by ignoring it, concedes that a failure to satisfy

8  *AGC* for the Sherman Act requires dismissal of its Arizona claims.

9      ***California***.  MiCamp similarly ignores the precedent cited by Visa in which courts

10  interpreting the Cartwright Act's antitrust standing requirement have consistently followed the

11  "'market participant' rule" to plead antitrust injury.  *See* Mot. at 20 (citing *In re Napster, Inc.*

12  *Copyright Litig.*, 354 F. Supp. 2d 1113, 1125–26 (N.D. Cal. 2005); *Lorenzo v. Qualcomm Inc.*, 603

13  F. Supp. 2d 1291, 1302 (S.D. Cal. 2009)).  For the reasons already discussed, MiCamp fails to

14  allege that it suffered an injury in the market where competition is allegedly being restrained, and

15  that also compels dismissal of MiCamp's Cartwright Act claim.  *See supra* at 6.

16      **B.    MiCamp Fails to Allege Essential Elements of Monopolization Claims**

17      Even if MiCamp could establish standing (it cannot), its Opposition fails to establish that

18  MiCamp has pled any element of a Sherman Act or state monopolization claim, including a relevant

19  market, monopoly power, exclusionary conduct, anticompetitive effects, attempt, or conspiracy.

20      **1.    MiCamp's Failure to Plead a Relevant Antitrust Market Necessitates Dismissal of Federal and State Claims**

21

22      MiCamp's market definition flaws doom its federal and state claims.[7]

23      ***Inconsistent Definitions***.  MiCamp's multiple and inconsistent market definitions fail to put

24  Visa on fair notice of the claims against which it must defend.  MiCamp admits that it attempts to

25  define a "Card Payment Processing Services Market."  Opp. at 13 (citing SAC ¶¶ 37–45).  However,

26  it ignores that virtually all of its causes of action do not utilize that alleged market and instead

27

28  [7] MiCamp's arguments regarding an alleged *per se* violation under California law fail for the reasons discussed below.  *See infra* at 15.

1    reference an alternative, undefined "general-purpose payment card network market" or simply the

2    "payments industry" for its Cartwright Act claim.  Mot. at 11–12 & n.7, 19–20, 20–21 (citing SAC

3    ¶¶ 87, 88, 97, 100, 112, 116–17, 126, 129, 141–42).  While MiCamp argues in its Opposition that

4    "[t]he 'general-purpose payment card network market' is not a separate market but rather a

5    component of the broader Card Payment Processing Services Market" (Opp. at 13), the SAC is devoid

6    of any allegations regarding a submarket.  MiCamp attempts to tie together its conflicting market

7    allegations by arguing that "MiCamp further alleges that Visa's share of the 'general-purpose

8    payment card network market' is over 61%, and that this market is part of the broader Card Payment

9    Processing Services Market."  Opp. at 13 (citing SAC ¶ 43).  But paragraph 43 of the SAC does not

10   connect these two market definitions.  SAC ¶ 43 ("Visa has monopoly power, including the fact that

11   over 61% of all general-purpose card payments nationwide are conducted with Visa's Card Payment

12   Processing Services.").

13          *No Factual Support*.  MiCamp fails to factually support any market definition it has put

14   forward in the SAC.  MiCamp contends that it has supported its market definition "with factual

15   allegations addressing the lack of interchangeability between Visa's services and other payment

16   methods" (Opp. at 14), but MiCamp admits that its only basis in the SAC to exclude cash as a

17   substitute for cards is that cash supposedly "lack[s] widespread acceptance at the point-of-sale."  SAC

18   ¶ 41; Opp. at 14.  MiCamp does not defend this facially nonsensical allegation.  Mot. at 13.  MiCamp

19   also offers no coherent response to the fact that exclusion for market definition purposes of "Cash,

20   ACH, and cryptocurrency" as reasonable substitutes to payment cards in response to a price increase

21   cannot be reconciled with MiCamp's allegations that price increases in the form of surcharging would

22   lead to substitution by those forms of payment and drive down card prices.  Mot. at 13; Opp. at 14.

23          *Single-Sided Market*.  MiCamp's Opposition also asserts that the SAC alleges a "single-sided

24   market for card payment processing services."  Opp. at 16.  That assertion creates a new and

25   independent legal flaw to MiCamp's market definition.  In *Ohio v. Am. Express Co., Inc. ("Amex")*,

26   585 U.S. 529 (2018), the Supreme Court held that Visa competes in a two-sided payment card

27   market.  *Id.* at 544 ("[C]ourts must include both sides of the platform—merchants and cardholders—

28   when defining the credit-card market.").  Subsequent cases have affirmed that the relevant market for

VISA'S REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT    CASE NO. 4:23-cv-06351-HSG

platforms such as Visa is two-sided.  *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019) ("In cases involving two-sided *transaction* platforms, the relevant market must, as a matter of law, include both sides of the platform."); *Coronavirus Rep. v. Apple Inc.*, No. 21-CV-05567-EMC, 2021 WL 5936910, at *13 (N.D. Cal. Nov. 30, 2021) ("Plaintiffs' failure to allege relevant markets that encompass or even address the two-sided nature of the iOS App market renders their market definitions insufficient as a matter of law.") (citing *Amex*, 585 U.S. at 546).

### 2.    MiCamp Fails to Allege Monopoly Power

MiCamp does not dispute that absent a properly defined market, it cannot show monopoly power.  MiCamp also admits that it does not allege a market share of the "Card Payment Processing Services Market" it claims to have defined.  Opp. at 14.  It instead argues that it "alleges that Visa controls over 61 percent of all general-purpose card payments nationwide." *Id.* (citing SAC ¶ 43).

Even if the 61% figure related to the alleged market, that would be insufficient to allege monopoly power.  Mot. at 14 (citing *Aurora Astro Prods. LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132, 1147 (N.D. Cal. 2023)).  The SAC is devoid of any allegations about the ability of Visa's payment card network rivals to compete with Visa or substitute for Visa transactions if Visa raised its prices to supracompetitive levels.  Nor does the SAC allege how many card network competitors Visa has, their conduct, or their successes.  In these circumstances, a 61% share of what MiCamp (mis)characterizes as a submarket is insufficient.

Nor do the cases that MiCamp cites support its assertion that "[a]t the motion to dismiss stage, courts in this jurisdiction have held that a complaint may survive even where the alleged market share is below 65%."  Opp. at 14 (citing *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 958 (D. Or. 2018)).  The court in *CollegeNet* explained that "[c]ourts generally require a 65% market share to establish a prima facie case of market power." *CollegeNet, Inc.*, 355 F. Supp. 3d at 958.  There, the plaintiff "allege[d] that Defendant has at least a 60% market share in the Online Processing Market and a 90% share in the Data Services Market," but the parties "dispute[d] the appropriate way to calculate market share," creating an issue of fact that could not be resolved at the pleading stage.  *See id.* at 953, 958–59.  MiCamp identifies no similar dispute here.  Similarly, in *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 925 (9th Cir. 1980), plaintiff alleged a

1    65% market share and "that the share was increasing." MiCamp alleges neither here. Moreover, in

2    this pre-*Twombly/Iqbal* decision, the Ninth Circuit reasoned only that it could not say a 65% share

3    could not support market power "under any market condition," *id*., which "of course, is not the same

4    as declaring that an allegation of a certain threshold of market share is sufficient to plead

5    monopolization" under *Twombly/Iqbal*, *DeSoto Cab Co., Inc. v. Uber Techs., Inc.*, No. 16-cv-06385-

6    JSW, 2018 WL 10247483, at *8 n.9 (N.D. Cal. Sept. 24, 2018). Nor did *Hunt-Wesson* make any

7    "mention of potential barriers to entry . . . , which innumerable, more recent cases have suggested is

8    crucial" and renders *Hunt-Wesson* "distinguishable." *Id*.

9         Indeed, MiCamp also does not dispute that it must allege "entry barriers" in order to plead a

10   monopolization claim. *See* Opp. at 14; *see also* Mot. at 14 (plaintiff must allege "significant barriers

11   to entry and . . . that existing competitors lack the capacity to increase their output in the short run").

12   While MiCamp conclusorily asserts that "Visa's conduct has created and reinforced barriers to entry

13   in the market" (Opp. at 14–15), MiCamp cites no allegations in the SAC to support that

14   assertion. That is because the SAC barely mentions Visa's rival payment card networks and does not

15   allege any facts as to any barriers that prevent entry or expansion by the multiple, existing card

16   networks that compete every day with Visa. MiCamp simply asserts that "Visa's market share is not

17   offset by competitive pressure from other cards networks." Opp. at 15 (citing SAC ¶¶ 43, 65, 91). But

18   paragraph 43 of the SAC says nothing about competitive pressure from other networks. Paragraph

19   65 alleges only that MiCamp must offer Visa's services to merchants but does not allege that is not

20   also true of Mastercard, American Express, or Discover (or other payment card networks). And

21   paragraph 91 alleges only that "other cards on the market . . . are of similar quality to Visa" without

22   mention of competitive pressure from those other networks. MiCamp alleges only that Visa has

23   "obtained . . . a large share of the market" (SAC ¶ 65) without alleging barriers to entry or expansion

24   that would prevent other card networks from taking that share if Visa raised prices above competitive

25   levels. Instead of identifying those barriers to participants in the alleged market, MiCamp points to

26   products that it alleges are not in the market. Opp. at 15 ("MiCamp further pleads that Visa suppresses

27   competition from other forms of payment, including cash, ACH, and cryptocurrency."). MiCamp

28   therefore does not plead monopoly power in an alleged relevant market.

### 3.     MiCamp Fails to Allege Exclusionary Conduct

MiCamp agrees that exclusionary conduct is conduct that "tends to impair the opportunities of rivals." Opp. at 15.  But MiCamp does not claim that it is a rival of Visa or that the SAC alleges anything about how Visa's rules impair the opportunities of other payment card networks in the alleged relevant market.  Rather, it claims that Visa's rules limit merchant steering to products *not in* the alleged market (cash, ACH and cryptocurrencies).  *Id.*[8]  MiCamp also fails to distinguish *Amex*, where the Supreme Court explained why non-discrimination provisions are beneficial (Mot. at 15), contending only that *Amex* "involved a different factual context and a full trial record, and it does not hold that all non-discrimination rules are inherently lawful." Opp. at 16.  MiCamp does not dispute that the SAC is silent as to the similar rules of Visa's rival payment card networks and that those rivals similarly enforce their own rules.  *Id.*  While MiCamp may not need to "negate the legality" of the rules of Visa's rivals, *id.*, it must allege facts showing how Visa's challenged rules have an exclusionary effect on those rivals in the alleged market.  MiCamp does not attempt to do so.

### 4.     MiCamp Does Not Allege Injury to Market-Wide Competition

MiCamp further admits that it must also plead an "anticompetitive impact on the 'market as a whole.'" Opp. at 17.  But, again, it points to the exclusion of other forms of payment that are, according to MiCamp, not in the relevant antitrust market.  *See id.* ("MiCamp does not include those alternatives [*i.e.*, cash, ACH transfers, and cryptocurrency] in its defined relevant market").  MiCamp's SAC contains no allegations that Visa's competitors within the proposed relevant market are being excluded by Visa's alleged conduct.

### 5.     MiCamp Fails to Allege Attempted Monopolization

MiCamp also fails to adequately allege the elements of attempted monopolization.  MiCamp argues that it has alleged a specific intent to destroy competition because Visa's conduct was "designed to destroy competition from rival payment processors that promote more cost-effective payment methods for merchants and consumers." Opp. at 18.  As an initial matter, MiCamp is not a "rival payment processor" to Visa.  And the "more cost-effective payment methods" to which

---

[8] Alternatively, if those products were in the market, MiCamp does not allege Visa's market share of that market or how Visa plausibly has monopoly power in a broader market.

1    MiCamp points (cash, ACH, and cryptocurrency) are *not* in the alleged market—rendering the

2    argument a non sequitur.   MiCamp does not identify any rival payment processors *in the market*

3    that Visa targeted with an intent to destroy competition in the alleged market.  Nor does MiCamp

4    allege that Visa's surcharge rules are dissimilar to those of its rival networks.  *See, e.g.*, Mot. at 15

5    (discussing Amex's non-discrimination rules and MiCamp's failure to distinguish Visa's rules from

6    those of Mastercard, Amex, and Discover, among other payment card networks).

7        MiCamp similarly fails to allege any predatory or anticompetitive conduct by Visa, pointing

8    only to non-compliance assessments issued due to merchants' violations of Visa's surcharge rules.

9    Opp. at 18.  As already discussed, Visa's surcharge rules ensure a positive consumer experience at

10   the point of sale to prevent negative externalities for all participants in Visa's payment system.

11   Mot. at 15; *supra* § III.B.3.  MiCamp also fails to allege a dangerous probability that Visa will

12   achieve monopoly power.  Mot. at 17 (courts require either "direct evidence of specific intent plus

13   proof of conduct directed to accomplishing the unlawful design, or (2) evidence of conduct alone,

14   provided the conduct is also the sort from which specific intent can be inferred").  MiCamp points

15   only to Visa's market share and rules to support this element, but MiCamp does not plead factual

16   allegations showing that Visa implements its rules with any "specific intent" to monopolize as

17   opposed to the pro-competitive/pro-consumer purposes identified by the Supreme Court in *Amex*.

18   Nor has MiCamp alleged facts showing that Visa's rules allow it to gain market share at the expense

19   of other payment card networks.

20              **6.      MiCamp Does Not Allege a Conspiracy to Monopolize**

21       MiCamp acknowledges that the SAC is silent as to with whom Visa allegedly conspired.

22   Opp. at 19 (alleging only "Does 1 through 10," who are "collectively referred to as the 'Visa

23   Agents'").  While a plaintiff in some circumstances may allege "Does" as defendants or co-

24   conspirators, the SAC does not offer even a description of those entities.  SAC ¶ 29.  This alone

25   warrants dismissal of the conspiracy to monopolize claim.  Mot. at 17 & n.4 (citing *Bell Atl. Corp.*

26   *v. Twombly*, 550 U.S. 544, 557 (2007)).  MiCamp's SAC also lacks any factual allegations that Visa

27   conspired with anyone in creating the Visa Rules.  Instead, MiCamp makes only conclusory

28   allegations that Visa and the "Visa Agents" "agree[d] on the Visa Rules."  SAC ¶ 102; *see also id.* ¶

1    29 (alleging that the "Visa Defendants" and "Does 1 through 10" were "co-conspirator[s] of the

2    others").  However, MiCamp does not identify any conduct by any other entity that was undertaken

3    vis-à-vis MiCamp pursuant to an agreement between Visa and that other entity.  Opp. at 19.

4    MiCamp does not, for example, allege any agreement between Visa and any acquiring bank that

5    requires the acquiring bank to pass on a NCA to MiCamp.  That is because MiCamp cannot so

6    allege in light of its prior complaints and sworn statements establishing that any pass on to MiCamp

7    is pursuant to *MiCamp's* agreements with acquiring banks and processors.  Nor does MiCamp

8    allege that these unidentified entities had a specific intent to monopolize.  Mot. at 18.

9         In addition, MiCamp misstates *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir.

10   2008), in arguing that it is distinguishable because *Kendall* involved only an alleged conspiracy

11   among banks.  Opp. at 19.  The Ninth Circuit also held that plaintiff failed to "allege any facts to

12   support [its] theory that the Banks conspired or agreed . . . *with the Consortiums [i.e., Visa and*

13   *Mastercard]* to restrain trade."  *Id*. (emphasis added).  As in *Kendall*, MiCamp provides no non-

14   conclusory allegations regarding any conspiracy between Visa and unidentified "Visa Agents."

15        **C.     MiCamp Fails to Allege State Antitrust or Unfair Competition Claims**

16        As already noted, MiCamp's Arizona and California claims fail for lack of antitrust

17   standing.  *See supra* § III.A.3.  These claims also fail on the merits.

18        ***Arizona.***  MiCamp's Arizona monopolization, attempted monopolization, and conspiracy to

19   monopolize claims fail on the merits for all the reasons already discussed.  *See supra* §§ III.B.1–6.

20   MiCamp does not contest that, with the exception of *Illinois Brick*, Arizona's antitrust statute is

21   construed in accordance with federal antitrust law.  Mot. at 19.  The SAC also includes Arizona

22   restraint of trade allegations based on agreements "with issuing banks, acquiring banks, and even

23   other card brands" that lead to "price-fixing" and a "monopoly over, the general-purpose payment

24   card network market" (SAC ¶ 112), but MiCamp does not defend those allegations at all in response

25   to Visa's arguments.  Mot. at 19–20.  MiCamp thus concedes that they should be dismissed for each

26   reason set forth in Visa's motion.  *See Pernell*, 650 F. Supp. 3d at 933.

27        ***California***.  MiCamp similarly fails to address the fact that the Cartwright Act does not

28   reach unilateral monopolization conduct.  Mot. at 20–21.  Nor does MiCamp attempt to defend its

1    conclusory allegations of a restraint of trade under the Cartwright Act or address the fact that it has

2    failed to allege an "unreasonable" restraint of trade. *Id*. at 21 (noting MiCamp's cursory reference

3    to "agreements" with "banks" that consist of setting processing fees and network rules). And

4    MiCamp fails to defend its UCL claim in its Opposition. *Id*. at 20–21.

5        ***Unpled Resale Price Maintenance.*** Instead of defending the state claims in the SAC,

6    MiCamp pivots to discussing "resale price maintenance" under Arizona and California law (Opp. at

7    23–24), but resale price maintenance is not referenced anywhere in the SAC. Resale price

8    maintenance involves a supplier's agreement "with its distributor to set the minimum price the

9    distributor can charge for the [supplier's] goods." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,

10   551 U.S. 877, 881–82 (2007) (holding that because resale price maintenance can have

11   "procompetitive effects," it is subject to the rule of reason).[9] MiCamp's invocation of the theory is

12   an attempt to jam a square peg into a round hole—it has no applicability here. Merchants do not

13   resell Visa's services; they sell goods and services to consumers, some of whom pay merchants with

14   Visa-branded payment cards. Merchants can price their goods and services at whatever level they

15   want. The fact that Visa has a rule regulating surcharging to ensure welcome acceptance of cards on

16   its network is not resale price maintenance, and the Supreme Court has held that there is nothing

17   inherently anticompetitive about similar welcome-acceptance provisions. *See* Mot. at 15.

18       ***State Law Price-Fixing***. Nor does MiCamp identify any "price-fixing agreement" between

19   Visa and any other entity that could constitute a *per se* violation of the Cartwright Act. Opp. at 24.

20   MiCamp provides no factual allegations to support Visa having engaged in "price fixing" through

21   enforcement of its rules, and the mere fact that Visa prohibits or caps surcharges on certain

22   transactions is not a price-fixing agreement.

23   **IV.    CONCLUSION**

24       Visa respectfully requests that the Court dismiss the SAC with prejudice.

25

26   _____

[9] Resale price maintenance claims evaluated under the rule of reason must include allegations of
27   "(1) a contract, combination or conspiracy among two or more persons or distinct business entities;
(2) by which the persons or entities intended to harm or restrain trade or commerce among the
28   several States, or with foreign nations; (3) which actually injures competition." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).

VISA'S REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT    CASE NO. 4:23-cv-06351-HSG

1  Dated:  July 15, 2025

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARNOLD & PORTER KAYE SCHOLER LLP

By:    /s/ *Sharon D. Mayo*
ANNE P. DAVIS
MATTHEW EISENSTEIN
SHARON D. MAYO
MICHAEL A. RUBIN
ANDREW S. HANNEMANN

Attorneys for Defendant
VISA INC.

- 16 -