UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICAMP SOLUTIONS, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>VISA INC.,<br><br>    Defendant. | Case No. 23-cv-06351-HSG<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 75 |

Pending before the Court is Visa's motion to dismiss MiCamp's second amended complaint. Dkt. No. 75 ("Mot."); Dkt. No. 78 ("Opp."); Dkt. No. 80 ("Reply"). The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). For the reasons discussed below, the Court **GRANTS** the motion, Dkt. No. 75.

**I.    BACKGROUND**

In March 2024, MiCamp filed a first amended class action complaint alleging that Visa engaged in anticompetitive conduct. Dkt. No. 24. The Court dismissed each of MiCamp's claims. Dkt. No. 70. Most relevant here, the Court found that MiCamp's Sherman Act claims were barred by the *Illinois Brick* doctrine, since MiCamp described itself as a "middleman" that did not incur the allegedly anticompetitive fines and fees from Visa directly. *Id.* at 11–12. The Court also held that MiCamp did not plead factual content to support its state antitrust claims. *Id.* at 7.

In April 2024, MiCamp filed the operative second amended complaint, which no longer brings claims on behalf of a putative class. Dkt. No. 73 ("SAC"). To overcome the Court's prior holding, MiCamp has stripped away almost all of the factual background explaining what MiCamp is, what service it provides, who its merchants are, and what role other actors—like

acquiring and issuing banks—play in the rest of the alleged market. The resulting complaint is muddled, but MiCamp generally alleges that it was a purchaser of Visa's "Card Payment Processing Services," which required MiCamp's compliance with Visa's allegedly anticompetitive rules. SAC ¶¶ 21, 67. Those rules were allegedly enforced through non-compliance assessment ("NCA") penalties, which were collected from MiCamp by nameless "Visa Agents" whenever MiCamp's merchants were found to be out of compliance—a fact that was sometimes discovered through Visa's use of secret shoppers. *Id.* ¶¶ 70, 75, 80. In particular, MiCamp takes issue with Visa's (1) prohibition on surcharging customers who use a Visa general purpose credit or debit card more than 3% (the no-surcharging rule); (2) limitations on offering a discount to customers who use cash (the cash discounting rule); and (3) general prohibition against steering customers to cheaper methods of payment processing "such as cash, ACH, or cryptocurrency, among others" (the anti-steering provision). *Id.* ¶¶ 68–71. MiCamp alleges that this conduct has caused it to suffer financial harm, damaged its relationships with its clients, and reduced its consumer choice for alternative payment processing services. *Id.* ¶ 75.

MiCamp asserts claims for monopolization, attempted monopolization, and conspiracy to monopolize in the "Card Payment Processing Services Market" under Section 2 of the Sherman Act. *Id.* ¶¶ 86–107. MiCamp also alleges that Visa violated Arizona's state antitrust laws, Ariz. Rev. Stat. §§ 44-1402, *et seq.*, California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*, and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* SAC ¶¶ 108–44. Visa moves to dismiss MiCamp's complaint under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 75.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule

12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

## III. DISCUSSION

Visa argues that MiCamp's complaint is "devoid of any facts from which this Court could find antitrust standing under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745–46 (1977) [("*Illinois Brick*")], or *Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 537–46 (1983)." Mot. at 8. Visa also argues that MiCamp has failed to adequately plead the elements of its Sherman Act and state law claims. *Id.*

### i. Previous Allegations

Before considering Visa's arguments, the Court must address the parties' dispute about whether the Court may refer to MiCamp's previous allegations. As Visa correctly observes, "MiCamp responded to this Court's dismissal order . . . by expunging [almost every] factual allegation detailing what MiCamp is and what role it plays in the payment card system." Mot. at 8. At times, MiCamp's newest complaint seems to contradict MiCamp's earlier, now-removed factual allegations, which Visa frequently emphasizes in its briefing. For example, Visa notes that MiCamp's prior allegations and sworn declarations implied or outright stated that Visa does not directly assess NCA penalties against MiCamp. Mot. at 8, 10; Dkt. No. 67-1 ¶¶ 7, 11 (declaration from MiCamp president stating that "[independent sales organizations like MiCamp] facilitate the relationship between the merchants and the Acquirers" and "Acquirers pay Visa fees"); Dkt. No. 64 ¶¶ 3, 9 (declaration from MiCamp director of operations stating that "Visa is effectively fining

3

the *Merchant* directly") (emphasis added).  Now, MiCamp alleges that an undefined group of "Visa Agents . . . collect the NCA penalty on Visa's behalf," SAC ¶ 80, and elsewhere implies that MiCamp pays these fees directly, *id.* ¶ 121 ("Visa assessed hundreds of thousands of dollars in NCA Penalties against MiCamp.").[1]

Visa argues throughout its motion that MiCamp "cannot plead around a court's dismissal order by merely deleting the prior allegations that demonstrated its inability to establish standing or state a claim" and urges the court not to accept as true contradictory allegations in the amended complaint.  Mot. at 12; *see also id.* at 15, 17, 24, 28.  MiCamp argues that an amended complaint supersedes the original, and the "Court's analysis should be confined to MiCamp's allegations in the SAC."  Opp. at 11.  It also argues that the Court should not consider materials outside the pleadings, such as prior declarations, in a 12(b)(6) motion to dismiss.  *Id.*

Circuit precedent on allowing contradictory amendments is surprisingly unclear.  The Ninth Circuit has held that a "party cannot amend pleadings to directly contradic[t] an earlier assertion made in the same proceeding."  *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) (quotation omitted).  However, other Ninth Circuit panels have conversely held that "there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations" and "[t]he district court has no free-standing authority to strike pleadings simply because it believes that a party has taken inconsistent positions in the litigation."  *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 859–60 (9th Cir. 2007); *Allen v. City of Arcata*, 691 F. App'x 461, 463 (9th Cir. 2017) (non-precedential opinion observing that "nothing in the Federal Rules of Civil Procedure prohibits inconsistent pleadings").  District courts have acknowledged this competing precedent, and "many other district courts" have decided to permit contradictory amendments, "which is more consistent with the Ninth Circuit's liberal policy favoring amendment."  *Kanaan v. Yaqub*, No. 21-CV-09591-BLF, 2022 WL 3357834, at *4 (N.D. Cal. Aug. 15, 2022).

---

[1] Whether this example is actually contradictory is an open question, since MiCamp is careful not to explicitly argue that it paid the NCA penalties to Visa directly.  *See generally* Opp.

Even assuming without deciding that the Ninth Circuit permits contradictory amendments, that does not necessarily mean the Court cannot consider "the prior allegations as part of its 'context-specific' inquiry based on its judicial experience and common sense to assess whether an amended complaint plausibly suggests an entitlement to relief." *Hernandez v. Schaad*, No. 17-CV-04055-HSG, 2017 WL 6731624, at *3 (N.D. Cal. Dec. 29, 2017) (quotation omitted). Several courts have held that "the Court does not ignore the prior allegations in determining the plausibility of the current pleadings and is not required to accept as true contradictory allegations in an amended complaint without more facts." *Morales v. City & Cnty. of San Francisco*, 603 F. Supp. 3d 841, 846 (N.D. Cal. 2022) (quotations omitted) (cleaned up); *see also J. Edwards Jewelry Distrib., LLC. v. Wells Fargo & Co.*, No. 18-CV-03886-YGR, 2019 WL 2329248, at *4 (N.D. Cal. May 31, 2019) (noting plaintiff "cannot avoid application of the statute of limitations by simply deleting from its amended complaint allegations evidencing its discovery of the factual basis of its UCL claim").

Nevertheless, absent clear authority on this issue, the Court will avoid wading into a granular comparison between MiCamp's allegations here and in its prior complaints.[2] The Court also will not consider arguments and allegations made in prior briefing and declarations, since "[i]n determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (emphasis in original).[3] Ultimately, this makes little practical difference here, since the Court views the primary issue to be the fact that MiCamp "replace[d its] prior allegations . . . with only conclusory allegations . . . not additional facts." *See Colombo v. Palo Alto Unified Sch. Dist.*, No. 24-CV-00909-NC, 2025 WL 929955, at *10 (N.D. Cal. Mar. 27, 2025).

---

[2] If Visa "believes that its opponent pled in bad faith, it can seek other means of redress, such as sanctions under Rule 11, 28 U.S.C. § 1927 or the court's inherent authority." *PAE*, 514 F.3d at 860.

[3] Evidence outside the pleadings can be considered in a factual attack to standing under Rule 12(b)(1), *Leite v. Crane Co.*, 749 F.3d 1117. 1121 (9th Cir. 2014), but Visa's motion is brought solely under Rule 12(b)(6), since antitrust standing "does not implicate the subject matter jurisdiction of the court," *Gerlinger v. Amazon Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008).

**ii.   Sherman Act Claims (First, Second, and Third Causes of Action)**

Visa argues that MiCamp lacks standing as an indirect purchaser and under the *AGC* factors. Mot. at 12–17. It also argues that MiCamp hasn't adequately pleaded the elements of MiCamp's Sherman Act claims. *Id.* at 17–25. The Court agrees that MiCamp lacks antitrust standing and does not reach Visa's other arguments.

*a.   Illinois Brick*

In its previous order, this Court dismissed MiCamp's Sherman Act claims for failure to allege that it was a direct purchaser that could recover under *Illinois Brick*. Dkt. No. 70 at 10–12. In *Illinois Brick*, the Supreme Court established that "indirect purchasers" may not recover antitrust damages, holding that "only a direct purchaser of the [product] . . . is a party 'injured in his business or property' entitled to sue under Section 1 of the Sherman Act, not another party in the chain of manufacture or distribution." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) (citing *Illinois Brick*, 431 U.S. at 729, 735–37); *see also Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019) ("[I]f manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator. And C may sue B if B is an antitrust violator. That is the straightforward rule of *Illinois Brick*.").[4] Only "[d]irect purchasers—meaning those who buy the relevant product directly from the alleged antitrust violator—can bring antitrust suits . . . under the Sherman Act." *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1064 (9th Cir. 2021). The Ninth Circuit applied *Illinois Brick* in the context of an antitrust suit between credit card companies and banks—also at the motion to dismiss stage—and held that where plaintiffs "are the middlemen" and lack a "contractual relationship with [Visa and Mastercard] directly" plaintiffs run "squarely into the *Illinois Brick* wall" and are unable to establish injury. *Kendall*, 518 F.3d at 1048–50.

Visa argues that MiCamp still has not pleaded that it was a direct purchaser. Mot. at 13–14. MiCamp responds that it has cured this defect on amendment, alleging that it is a "direct purchaser of Visa's Card Payment Processing Services." Opp. at 14; *see also* SAC ¶ 21. MiCamp

---

[4] The Ninth Circuit applies the indirect purchaser rule to Section 2 of the Sherman Act. *See, e.g.*, *Somers v. Apple, Inc.*, 729 F.3d 953, 961–62 (9th Cir. 2013).

points to four allegations that it claims support its status as a direct purchaser: (1) it pays Visa $5,000 to register for the right to sell Visa's Card Payment Processing Services and an additional $5,000 annually to renew that registration, SAC ¶ 21; (2) in order to use Visa's services, MiCamp is required to register its merchants and comply with Visa's rules, including its NCA penalties and secret shopper monitoring, *id.* ¶ 52; (3) Visa levies NCA penalties against MiCamp through "Visa Agents," *id.* ¶ 80; and (4) MiCamp must appeal penalty decisions directly to Visa, *id.* In short, "MiCamp alleges it pays Visa directly, is regulated and penalized by Visa directly, and sells Visa's services under Visa's terms." Opp. at 14.

At this stage, the Court cannot clearly determine that MiCamp's claim is barred by *Illinois Brick*. MiCamp has amended its pleadings to allege that it directly purchased Visa's Card Payment Processing Services. SAC ¶¶ 21, 80.[5] As alleged, "[t]here is no intermediary in the distribution chain between [Visa] and [MiCamp]," and "direct purchasers from monopolistic retailers are proper plaintiffs to sue those retailers." *Pepper*, 587 U.S. at 281–82. The Court must follow this "straightforward" and "dispositive" rule. *Id.* at 280–81.

Visa argues that MiCamp's allegations are too vague, claiming it "does not allege that it paid *any* fees directly to Visa." Mot. at 14 (emphasis in original). But this is contradicted by MiCamp's allegation that MiCamp "paid *Visa* $5,000 to register for the right to sell Visa's Card Payment Processing Services, and it pays $5,000 per year *to Visa* to renew its registration." SAC ¶ 21 (emphasis added). Visa also argues that this allegation is contradicted by Visa's documents showing that Wells Fargo—as MiCamp's agent—registered MiCamp with Visa. Mot. at 11 (citing Dkt. Nos. 46-1 & 46-10). As discussed, absent the applicability of the incorporation by reference doctrine,[6] the Court will not consider outside evidence introduced by Visa at the motion

---

[5] MiCamp also alleges that it sells Visa's services on to its merchants, *id.* ¶ 80, seemingly to emphasize its role as a direct purchaser and its merchants' role as indirect purchasers.

[6] Visa argues that the registration documents form the basis of the complaint and are subject to incorporation by reference. Mot. at 11 n.3 (citing *Logan v. Meta Platforms, Inc.*, 636 F. Supp. 3d 1052, 1055 n.3 (N.D. Cal. 2022)). But the fact that the registration step is important to MiCamp's theory does not mean that the registration documents themselves form the basis of the complaint.

7

to dismiss stage.[7] Finally, Visa argues that MiCamp does not connect its payment of registration fees to any theory of anticompetitive conduct. Mot. at 14. For the purposes of analyzing *Illinois Brick*, the Court disagrees. MiCamp alleges that it directly purchased and registered with Visa's card payment processing services, which imposed rules that allegedly restricted competition in the market. It's not clear why MiCamp would need to allege anything further to show it is a direct purchaser of the relevant product.[8]

### b. Antitrust Standing Under AGC

Visa next argues that MiCamp lacks standing under the *AGC* multi-factor test. Mot. at 14. "Antitrust standing is distinct from Article III standing. A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 n.3 (9th Cir. 1999). Courts consider several factors, no one of which is dispositive: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Id.* at 1054; *AGC*, 459 U.S. at 537–

---

[7] That said, this does not mean that parties like MiCamp may treat pleadings like a game, hiding and removing known facts as they please to avoid application of the law. Had this case made it past the motion to dismiss stage, Visa may well have been able to show via additional evidence that MiCamp is not a direct purchaser such that its claims are barred by *Illinois Brick*. If this case had proceeded, and facts had emerged inconsistent with the pleadings here (and consistent with MiCamp's prior claims), MiCamp and its counsel's compliance with Rule 11 and the duty of candor definitely would have been called into question.

[8] It's less obvious if MiCamp has standing under *Illinois Brick* to assert a theory of harm related to the NCA penalties. MiCamp has not adequately pleaded that it directly paid the NCA penalties, since it concedes that "[w]hen Visa issues NCA Penalties . . . it asks the Visa Agents to collect the NCA Penalty on Visa's behalf." *Id.* ¶ 80. MiCamp does not plead *any* facts to support the conclusory assertion that there are third parties collecting these fees that are acting as Visa's agents. As a result, this is similar to cases that were dismissed for failure to plead that the plaintiff directly paid the pass-on fees. *Compare Pepper*, 587 U.S. at 281 (standing where the "iPhone owners pay the alleged overcharge directly to Apple"), *with In re ATM Fee Antitrust Litig.*, No. C 04-02676 CRB, 2010 WL 3701912, at *5 (N.D. Cal. Sept. 16, 2010), *aff'd*, 686 F.3d 741 (9th Cir. 2012) (no standing where "Plaintiffs do not dispute that they pay the purportedly unlawful interchange fee only indirectly"). The parties do not address this complexity, and MiCamp's conclusory allegations make analyzing this difficult. But for the reasons discussed above, MiCamp's claims at least partially survive *Illinois Brick*, since MiCamp has pleaded a "contractual relationship," even if it has not pleaded that it is "charged the . . . fee directly." *Kendall*, 518 F.3d at 1049.

46. The first factor—antitrust injury—"is necessary, [although] not always sufficient." *See Am. Ad Mgmt.*, 190 F.3d at 1055 (quotations omitted) (cleaned up).

### i.  Antitrust Injury

There are "four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Id.*  The harm must be to competition: "removal of one or a few competitors need not equate with injury to competition." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989).  And a plaintiff must allege "that [its] injury occurred in the market where competition is being restrained." *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 911 (N.D. Cal. 2019) (quotation omitted) (cleaned up).

Visa argues that MiCamp has not shown that its injury occurred in the market where competition is being restrained since it has omitted any allegations about what market MiCamp operates and competes in.  Mot. at 14–15.  Visa also argues that MiCamp's allegations of harm lack factual support and contradict its prior allegations.  *Id.* at 11, 15.

MiCamp argues that it has shown that Visa engaged in unlawful conduct through imposition of "illegitimate NCA penalties" and "enforcement of restrictive Rules designed to fix pricing and exclude competition." Opp. at 15.  That unlawful conduct has apparently (1) "expanded Visa's monopolistic control to the point that MiCamp has no viable alternative but to conduct business with Visa"; (2) "restricted surcharge and cash discounting practices beyond what state and federal law require"; (3) "injured MiCamp's relationships with its merchants and clients by creating tension and driving loss of goodwill and retention"; (4) forced MiCamp to impose less favorable pricing; (5) "suppressed competition from other service providers that MiCamp could otherwise offer to its clients"; and (6) caused financial injury through the imposition of NCA penalties.  *Id.*  MiCamp claims that "[t]he alleged harms, including diminished ability to compete, exclusion from market opportunities, and reduced business performance, are of the type the antitrust laws were enacted to prevent." *Id.*

### 1. Miscellaneous Injuries

The first four theories can easily be discarded as lacking an adequate factual basis.  First,

9

Visa's expansion is not itself an antitrust injury to MiCamp without more. *See Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001) ("Increased concentration may make anticompetitive activity more likely, but in and of itself it does not amount to antitrust injury.").[9]

Second, the allegation that Visa restricted surcharges and cash discounting is likewise an allegation of potentially unlawful conduct, not of injury itself. To the extent MiCamp is arguing that the surcharging and cash discounting rules somehow forced it to impose lower prices or collect less money from customers, MiCamp has not provided any factual support.

This is a problem with MiCamp's theory of lost profits more generally: MiCamp does not allege how it makes money or how these rules reduce its profits (except to the extent MiCamp is allegedly paying NCA penalties). MiCamp's *merchants* (who are also not defined in the complaint) might take in less money from end users because merchants cannot offer cash discounting or impose higher surcharging, but MiCamp does not allege that it charges these fees to customers directly or that it must charge a lower price to its nameless merchants for its undefined services as a result.

Finally, MiCamp asserts that its relationships with clients have been injured "because of the tensions caused by the NCA penalties." SAC ¶ 75. But it does not offer any factual support for this conclusory assertion, and this allegation appears contrary to MiCamp's assertion that the NCA penalties are imposed on MiCamp, rather than its merchants. *See, e.g.*, *id.* ¶¶ 54, 74. If those penalties are being levied against MiCamp's customers (directly or indirectly), MiCamp should have alleged as much in its complaint.[10]

### 2. Reduced Consumer Choice

MiCamp argues that it faced reduced choice as a consumer in the card payment processing

---

[9] As discussed in more detail below, MiCamp's allegation that Visa expanded its monopolistic control is also entirely conclusory.

[10] MiCamp's allegations contain scattered references to other "harms." For example, MiCamp mentions in its Cartwright Act claim that it has lost "price-based competition because interchange fees are fixed and non-negotiable, resulting in no avenue to undercut rivals on price." SAC ¶ 143. MiCamp presumably left in this reference to interchange fees from its prior complaint, despite never referencing or explaining these fees anywhere else. The Court is satisfied that there are no other potentially plausible and supported theories of harm beyond those addressed here.

services market because of Visa's enforcement of "No Surcharging, Cash Discounting Prohibitions, and Anti-Steering provisions." SAC ¶ 68. Visa argues that "[b]y dropping all factual allegations about what MiCamp does in the payments industry . . . MiCamp pleads no facts to support that it is a participant in the market where the challenged conduct occurs." Mot. at 14–15. "Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Am. Ad Mgmt.*, 190 F.3d at 1057. Put differently, "the injured party [must] be a participant in the same market as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quotations omitted).

While the Court admittedly cannot discern what market MiCamp competes in from the complaint, MiCamp has clearly alleged that it is a consumer in the defined market. *See* SAC ¶ 37 (defining the "Card Payment Processing Services" market), ¶ 21 (stating MiCamp purchases in that market).[11] "The complaint's allegations unmistakably place all parties in the [card payment processing services] market—[MiCamp] as buyers and [Visa] as sellers." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000); *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022) (noting that "[b]usinesses that use a product or service as an input to provide another product or service can be consumers for antitrust purposes").

Nevertheless, there is no factual basis from which the Court can reasonably infer that output—or competition generally—was reduced in the card payment processing services market. *See* Mot. at 22–23.[12] MiCamp only ever "points to the exclusion of other forms of payment that are, according to MiCamp, not in the relevant market." Reply at 16. MiCamp states that "Visa's

---

[11] As Visa observes, MiCamp frequently references a second, undefined market. *See, e.g.*, SAC ¶ 64 ("Visa has succeeded in establishing a monopoly in the general-purpose payment card network market."). While this is another clear defect in MiCamp's complaint, the Court assumes MiCamp is bringing claims relating to the more clearly articulated card payment processing services market, even though the outcome is the same whichever market the Court considers.

[12] Visa makes some of these arguments in the context of showing that MiCamp has not adequately pleaded exclusionary conduct or a market-wide injury. But Visa's argument is the same no matter where it's applied: MiCamp has not pleaded a factual basis supporting its theory of antitrust injury.

11

Anti-Steering rules explicitly prohibit purchasers (like MiCamp) from steering merchants toward using cheaper methods of payment processing (i.e., Visa's competition), such as cash, ACH, or cryptocurrency." SAC ¶ 69. Elsewhere, MiCamp similarly alleges that "[c]ash, ACH, and cryptocurrency are not reasonable substitutes for Card Payment Processing Services because they lack widespread acceptance at the point-of-sale, which is a problem created in major part by Visa's anticompetitive acts." *Id.* ¶¶ 41, 45. But MiCamp agrees that alternative processing services that handle cash, ACH, and cryptocurrency are outside the relevant market. *Id.* ¶ 83 ("The Card Payment Processing Services market is not remotely like the genuinely competitive ACH or crypto payment processing services markets . . . [and] there is an abundant supply of competing ACH and cryptocurrency payment processing services . . . ."); Opp. at 23 ("MiCamp does not include those alternatives in its defined relevant market . . . .").

Conspicuously absent are any facts showing that other *card* payment processing services are impacted by MiCamp's rules or conduct. There are almost no references in the complaint to other card brands or card payment processing services, and none from which the Court can infer that those other services are impacted. In fact, the only clear factual allegation about these alternatives primarily states that they exist in the status quo, despite Visa's allegedly anticompetitive behavior. SAC ¶ 91 ("There are other cards on the market (i.e., Discover and American Express) that are of similar quality to Visa.").

More generally, MiCamp's theory of harm to the card payment processing services market is not clear. For example, if MiCamp's theory is that Visa's rules make its card payment processing services more expensive, it's not clear why alternative card payment processing services would not be more attractive. It's possible that other card payment processing services are included in the "other methods" that merchants may not direct customers to under the anti-steering provision, *see id.* ¶ 117, but MiCamp does not allege this in its complaint or argue it in its briefing. Given this, the Court finds that MiCamp has not adequately pleaded reduced consumer choice as an antitrust injury. *Cf. Arcell v. Google LLC*, 744 F. Supp. 3d 924, 931 (N.D. Cal. 2024) (holding that "bare assertions that innovation is suppressed [and] user choice is reduced . . . are too vague and conclusory to plead a plausible antitrust injury" and noting that "[p]laintiffs do not say .

12

. . [how they] were prevented from accessing those improvements due to the . . . agreements" (quotations omitted) (cleaned up)).

MiCamp's responses are unpersuasive. MiCamp argues that "the SAC alleges that Visa's conduct suppresses the natural competitive pressure that these lower-cost models [like cash, ACH, and cryptocurrency] would exert on Visa and other card networks within the Card Payment Processing Services Market." Opp. at 23. MiCamp's allegations do not adequately plead such a theory. It points to its allegation that suppression of cash, ACH, and cryptocurrency "harms the Card Payment Processing market by stifling the free market and discouraging innovation which, in turn, allows Visa to control pricing in the general-purpose payment card market." SAC ¶ 77. This conclusory allegation is more of the same, as it does not provide any factual basis supporting an inference that a reduction in innovation in a *separate* payment processing services market will impact the card payment processing services market. MiCamp also points to its allegation that the ACH and cryptocurrency payment processing services markets are more competitive because "direct purchasers can offer products directly to their clients . . . without having to gain the approval of those who distribute those payment processing services, without paying NCA Penalties, and without paying an annual registration fee" which creates an "abundant supply" of alternatives. *Id.* ¶ 83. The Court does not fully understand what this allegation is saying, but it appears to be discussing a barrier to entry for direct purchasers like MiCamp, not for the providers of card payment processing services.[13]

MiCamp also argues that "Visa's pricing and penalty structure forces merchant processors to absorb or pass through elevated costs, further limiting competition on pricing and business model innovation." Opp. at 23. It's not clear what MiCamp means here, since the cited allegations don't directly support this argument. If MiCamp means that merchants face reduced business innovation and reduced ability to price competitively, MiCamp has not alleged that it is a merchant with standing for this injury. If MiCamp means its merchant customers will face penalties and demand lower prices from MiCamp, there is no factual support for this inference.

---

[13] If MiCamp's theory is that it is a competitor in the card payment processing services market, that is not adequately pleaded (and raises a host of other issues). *See* Mot. at 14–15.

### 3. NCA Penalties

MiCamp's remaining theory of harm is that it has suffered financial harms because NCA penalties were levied against it. MiCamp sometimes frames the NCA penalties as a higher cost that consumers must pay for Visa's card processing payment services as a result of its allegedly unlawful behavior. Antitrust injury can be shown through evidence of consumers facing "unlawfully elevated prices." *See Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 378 (9th Cir. 2003). As the Court has already explained, Visa's argument that MiCamp is not a market participant is insufficient here, since MiCamp has alleged it is a consumer in the market. And unlike with reduced consumer choice, there is adequate factual support that NCA penalties are levied against MiCamp, whether directly or indirectly. However, the Court finds that the previously discussed absence of non-conclusory allegations regarding conduct or effects in the card payment processing services market means that MiCamp has not adequately alleged that this injury is an antitrust injury.[14]

"[I]njury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). "If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995); *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 457 (9th Cir. 2021) ("[T]he proper focus is on whether the [plaintiff's] injuries flow from a decrease in competition among producers.").

While MiCamp may suffer financial harms from Visa, those "harms, even if real, are not 'anticompetitive' in the antitrust sense—at least not *directly*—because they do not involve restraints on trade or exclusionary conduct in 'the area of effective competition.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (emphasis in original) (quotation omitted). Setting a high price is not necessarily anticompetitive, and "there must be 'predatory' conduct to

---

[14] As before, this blends in some of Visa's argument about the lack of market-wide injury and exclusionary conduct when considering the elements of MiCamp's Sherman Act claims. Since those arguments are also properly directed towards the question of antitrust injury, the Court considers them here.

attain or perpetuate a monopoly for a monopolist to be liable under Section 2." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 549 (9th Cir. 1991) (citation omitted). MiCamp has not pleaded any facts from which this Court can reasonably infer that the allegedly higher prices here were the result of any anticompetitive behavior in or directed at the card payment processing services market. *Cf. name.space, Inc. v. Internet Corp. for Assigned Names & Numbers*, No. CV 12-8676 PA PLAX, 2013 WL 2151478, at *6 (C.D. Cal. Mar. 4, 2013), *aff'd*, 795 F.3d 1124 (9th Cir. 2015) ("At most, Plaintiff has alleged that it has been harmed by [defendant's] fee, but it alleges no evidentiary facts suggesting that the fee has actually injured competition.").[15]

MiCamp's conclusory allegations that Visa conspired with unnamed "Visa Agents" to levy these penalties do not transform this into antitrust injury. MiCamp does not allege any non-conclusory details about the Visa Agents, instead generically asserting that "Visa Agents transact business in and are found in this district" and are "other individuals and/or corporations" that Visa has conspired with to collect NCA penalties and enforce Visa's rules. SAC ¶¶ 33, 64; *cf. Kendall*, 518 F.3d at 1048 (noting that "the complaint does not answer the basic questions [about the conspiracy]: who, did what, to whom (or with whom), where, and when?" and observing that "merely charging, adopting or following the fees set by a Consortium" does not establish a Sherman Act violation).

In short, MiCamp's convoluted allegations, which counsel has now manipulated to remove many of the previously alleged facts, do not plausibly plead that any of Visa's alleged conduct constrains or relates to competition in the card payment processing services market, and MiCamp has not adequately pleaded antitrust injury. Because antitrust injury is mandatory to a showing of antitrust standing, *Am. Ad Mgmt.*, 190 F.3d at 1055, the Court **DISMISSES** MiCamp's Sherman Act claims.

---

[15] This conclusion is readily apparent without the Court needing to conduct an exhaustive consideration of whether MiCamp has pleaded the relevant unlawful conduct under its Sherman Act claims. *See, e.g.*, *Rebel Oil*, 51 F.3d at 1434 ("predatory or anticompetitive conduct directed" at "control[ing] prices or destroy[ing] competition" for attempted monopolization); *Cost Mgmt. Servs., Inc. v. Wash. Nat'l Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996) (willful acquisition or maintenance of monopoly power for monopolization). MiCamp does not come close to alleging facts that permit the Court to plausibly infer Visa's behavior had an impact on (or was directed at) the card payment processing services market.

### iii. State Law Antitrust Claims (Fourth Cause of Action)

Visa similarly argues that MiCamp has failed to plead antitrust standing for its state antitrust claims and has failed to plead the elements of each remaining claim. Mot. at 25–28. The Court agrees that MiCamp has failed to state a claim.

#### a. Arizona

Visa first argues that the Court should analyze MiCamp's standing for its Arizona claims using the *AGC* factors. *See id.* at 26 (citing *In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal. 2007), and *In re Interior Molded Doors Antitrust Litig.*, No. 3:18-CV-00718-JAG, 2019 WL 4478734, at *16 (E.D. Va. Sept. 18, 2019)). MiCamp does not directly respond to Visa's cited authority. Opp. at 27.

The Court declines to apply *AGC* here. In *In re Dynamic Random Access Memory*, the court noted that it was "unaware of any case law from [Arizona] that specifically considers and determines whether the *AGC* antitrust standing factors generally apply," but it decided to apply them because Arizona has a harmonization provision "calling for the statute[] to be construed in accordance with federal law." 516 F. Supp. 2d at 1095; *see also In re Interior Molded Doors*, 2019 WL 4478734, at *16 (relying on harmonization statute). But Arizona's harmonization provision only states that "courts *may use* as a guide interpretations given by the federal courts to comparable federal antitrust statutes," Ariz. Rev. Stat. § 44–1412 (emphasis added). "[S]imply because a state statute encourages reference to federal law does not impose a mandate on state courts to conform in fact to federal law," *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *10 (N.D. Cal. Oct. 2, 2014), and several courts have declined to rule on whether to apply *AGC* to Arizona antitrust cases as a result, *see, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007), *and Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, No. 13-CV-01180-BLF, 2015 WL 4755335, at *18–*19 (N.D. Cal. Aug. 11, 2015) (cataloging approaches). The parties do not seriously brief this split in opinions, and for now the Court will not read in such a specific standing requirement in the absence of authority from Arizona courts requiring it.

Nevertheless, the Court can easily determine that MiCamp has failed to state a claim.

16

MiCamp brings Arizona state law claims for monopolization, attempted monopolization, and conspiracy to monopolize, arguing the same theories as in its Sherman Act claims. SAC ¶¶ 115–37 (citing Ariz. Rev. Stat. § 44-1403). Visa reiterates that MiCamp has not alleged that any of Visa's conduct relates to competition in the card payment processing services market. Mot. at 26. The statute requires a plaintiff to show that an alleged monopolist acts "for the purpose of excluding competition or controlling, fixing or maintaining prices." Ariz. Rev. Stat. § 44-1403. As before, MiCamp has not explained how any of Visa's alleged conduct excludes competition or controls prices in the relevant market.

Additionally, Arizona courts "analyze the requirements necessary to prove a violation of section 44–1403 under federal case law interpreting § 2 of the Sherman Act." *Pasco Indus., Inc. v. Talco Recycling, Inc.*, 985 P.2d 535, 542 (Ct. App. 1998). All three of MiCamp's monopolization claims require causal antitrust injury as an element in the analogous federal claim. *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996) (monopolization); *Rebel Oil*, 51 F.3d at 1434 (attempted monopolization); *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) (conspiracy). The Court cannot find any federal or state opinions that do not require the core element of causal antitrust injury in Arizona state law claims, and this too warrants dismissal.

MiCamp's restraint of trade claim—for which MiCamp did not bring a Sherman Act analogue—is also plainly inadequate. *See* SAC ¶¶ 110–11. The statute requires "[a] contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade." Ariz. Rev. Stat. § 44-1402. MiCamp pleads that "Visa has entered into agreements with issuing banks, acquiring banks, and even other card brands with the intent of restraining trade." SAC ¶ 112. But as Visa notes, Mot. at 27, MiCamp (1) does not mention issuing banks or acquiring banks at any point prior; (2) does not mention any arrangements with other card brands; and (3) does not otherwise provide any factual basis to support this conclusory allegation. MiCamp additionally alleges that "Visa and the Visa Agents have all agreed to force purchasers and their merchants to follow the same rules regarding surcharging, cash discounting, and anti-steering." SAC ¶ 113. As discussed elsewhere, MiCamp provides no factual basis to support this allegation.

MiCamp does not seriously respond to Visa on these issues. Instead, it argues that it has adequately pleaded vertical price fixing under a resale price maintenance agreement, Opp. at 29, where a supplier agrees "with its distributor to set the minimum price the distributor can charge for the [supplier's] goods." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 881–82 (2007). The Court has serious doubts about the applicability of that theory here, but the Court need not address it, since the theory plainly is not pleaded. The Court **DISMISSES** MiCamp's Arizona state law claims.

### b. California

MiCamp also alleges that Visa "has entered into multiple agreements or combinations between itself and issuing banks and acquiring banks and other major card brands," in violation of the Cartwright Act. SAC ¶ 140. Visa argues that MiCamp's allegations are insufficient to plead any such agreement. Mot. at 28. MiCamp claims that it has shown unlawful price-fixing through resale price maintenance, which is a per se violation of the Cartwright Act.[16] Opp. at 30. As mentioned, MiCamp has not adequately pleaded any agreement between Visa and any banks or agents.[17] The Court thus **DISMISSES** this claim.

Finally, Visa argues that MiCamp's remaining UCL claim is predicated on its state law claims and should be dismissed along with them. Mot. at 28. MiCamp does not respond. The Court agrees that MiCamp's UCL claim is derivative and cannot survive on its own. *Formula One Licensing v. Purple Interactive*, No. C 00-2222 MMC, 2001 WL 34792530, at *4 (N.D. Cal. Feb. 6, 2001). The Court **DISMISSES** this claim.

## IV. CONCLUSION

Visa's motion to dismiss, Dkt. No. 75, is **GRANTED**. At this point, MiCamp has had

---

[16] MiCamp's cited source does not actually address whether this is a per se violation of the Cartwright Act.

[17] MiCamp also is apparently alleging that the agreement between MiCamp and Visa is itself an unlawful agreement to fix prices. SAC ¶ 142. This is nonsensical. If that theory was true, MiCamp may itself be a party to an unlawful agreement, and it's not clear how it would have standing to pursue this action. The Court also does not understand how MiCamp's agreement restricts the price that MiCamp can charge its merchants (partially because MiCamp does not say in the complaint what service it is charging for and who the merchants are).

ample opportunity to amend the complaint to state a viable claim, and has repeatedly failed to do so. Lawsuits are not a game of obfuscation. As the Court already told MiCamp's counsel in its prior order, attorneys have an obligation to present allegations that are "well-grounded in fact." Dkt. No. 70 at 3–4 (quoting *Smith v. Ricks*, 31 F.3d 1478, 1488 (9th Cir. 1994)). Despite this, MiCamp has made its complaint even harder to follow and removed most of its previous factual allegations in a transparent effort to avoid the Court's prior holding. The Court has serious concerns about this kind of gamesmanship, and **DISMISSES** the case without further leave to amend. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009), *as amended* (Feb. 10, 2009) ("[W]here the Plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, [t]he district court's discretion to deny leave to amend is particularly broad.") (quotation omitted). The Clerk is directed to enter judgment in favor of Visa and to close the case.

**IT IS SO ORDERED.**

Dated: 12/11/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge

19